DUNKLIN COUNTY, *Appellant*, v. CHOUTEAU.

Division One, March 5, 1894.

120   577
121   641

120   577
140   382

120     577
173   ¹451
173     458
173   ¹466
173   ¹470

1. **Swamp Lands:** PATENT: STARE DECISIS. The Dunklin county court subscribed for stock in a railroad corporation to be paid for in swamp land, under the authority of an act of the legislature of February 24, 1853, section 29, which enacted that the county court subscribing to such stock "may" for information cause an election to be held to ascertain the sense of the taxpayers, but no such election was had. Three months later the county superintendent of public works applied to the supreme court for a writ of *mandamus* to compel the county court to vacate the subscription for the reasons that appropriation of the swamp lands would not accomplish the purpose contemplated by the act of congress donating them to the state, was contrary to the wishes of the inhabitants of the county and was without legal authority. The question whether a vote of the taxpayers was essential to a legal subscription was not in terms made in the pleadings nor in the argument. The supreme court (23 Mo. 457) held that *mandamus* was not the proper remedy, but stated that, as the case presented a matter of public interest, it would determine all the questions involved. The court, without referring to the necessity of a vote of the taxpayers, held the subscription valid. The governor then issued a patent for the lands to the railroad company. *Held*, in an action by the county against a purchaser to set aside the patent, that the previous decision of the supreme court established as a rule of property that a vote of the taxpayers was not necessary to the validity of the subscription.

2. **County:** LACHES. The doctrine of laches applies to a county or other municipal corporation as well as to individuals.

3. ———: ———. The delay and conduct of a county may be a complete bar to a suit by it to set aside a patent for swamp lands, even though the defendant may not have had ten years' adverse possession of the lands.

4. **Patent:** MISRECITAL.  The fact that a patent by the state for swamp lands by mistake recited a subsequent act of the legislature relating to such lands as being the one under which a railway subscription was made instead of the correct one will not render the patent void.

*Appeal from Madison Circuit Court.*—HON. JAMES, D. Fox, Judge.

AFFIRMED.

*H. N. Phillips, C. P. Hawkins, Phillips & Walker* and *Wm. Carter* for appellant.

(1) The subscription of the county to the Cairo and Fulton Railroad Company and the conveyance of lands to satisfy such subscription was not authorized by the law of 1853, February 24, secs. 29, 32.  See act of February 23, 1853, and of March 3, 1851, as to purpose of the grant of the lands, and as to manner of disposition.  It could not donate these lands to the railroad company without further permission of the legislature.  (See act of February 23, 1853, sec. 2.) The purpose of the donation to the counties was, *first*, that they might be rendered tillable; *second*, to be sold. If necessary so to do, the counties were authorized to borrow money and issue the bonds of the county therefor, to carry the provisions of this act into effect. "May for information" means "shall." *Railroad v. Platte Co.*, 42 Mo. 175; *Barton Co. v. Walser*, 47 Mo. 189; *Steines v. Franklin County*, 48 Mo. 185; *Smith v. Clark Co.*, 54 Mo. 68; *Wilson v. Garroutte*, 67 Mo. 458; *Sturgeon v. Hampton*, 88 Mo. 213; *Railroad v. Hatton*, 102 Mo. 45.  There occurs no case in which the word "may" is construed to mean other than "shall" when prescribing and limiting duties and powers of county officers.  *Railroad v. Platte Co.*, 42 Mo. 171; *Steines v. Franklin Co.*, 48 Mo. 185.  (2) The transfer or subscription can not be sustained under act of December

7, 1855. Petition of a majority of the voters was necessary to give the court jurisdiction of the subject-matter. *Railroad v. Platte Co.*, 42 Mo. 175. If there was never an election (or petition) courts have never held bonds valid. *Steines v. Franklin Co.*, 48 Mo. 185; *Lingo v. Burford*, 21 S. W. Rep. 460; *Leonard v. Sparks*, 22 S. W. Rep. 899. (3) Plaintiff is not estopped to attack the order collaterally, for the order recites no petition, does not "judicially ascertain" the fact necessary for jurisdiction; hence it may be collaterally attacked. The order does not purport to be based upon any petition, or upon anything except a motion. *Lingo v. Burford, supra*; *Leonard v. Sparks, supra*. (4) The compromise deeds are void; they are not made by the proper officer, and are without any consideration. *Pool v. Brown*, 98 Mo. 681; *Sturgeon v. Hampton*, 88 Mo. 213; R. S. 1879, secs. 6153, 6150. (5) A county might convey title to swamp land by commissioner's deed from March 10, 1869, until the Revised Statutes of 1879 went into effect but at no other period of our law, March 27, 1868, p. 69. See Acts, 1851; Acts, 1853; Acts, 1855, p. 154, sec. 18; *Pool v. Brown*, 98 Mo. 681; Acts, 1856–7, p. 464; Acts, 1865 (Dunklin is exempted from this act). (6) At law statute of limitations can not be pleaded against the county, unless entry occurred prior to August 1, 1866. *Coleman v. Drane*, 22 S. W. Rep. 801; *State v. New Madrid Co.*, 51 Mo. County officials can not do indirectly what they are not allowed to do directly. (7) Laches will not be imputed where there is mere lapse of time, short of the statutory bar. For Dunklin county the statute provides no bar as to this case. *Bliss v. Pritchard*, 67 Mo. 191; *Kelly v. Hurt*, 61 Mo. 466; *Kline v. Vogel*, 90 Mo. 251. (8) Appellant applied to a court of equity simply because it thought at that time that it would require extrinsic evidence to show that the

patent and orders were void. *Mason v. Black*, 87 Mo. 345. (9) The county would not be estopped though it had received any benefits of the transaction, if it were void for the reason that its officers have acted without authority. *Book v. Earl*, 87 Mo. 256.

*G. A. Madill* and *Lionberger & Shepley* for respondent.

(1) The act of congress and the patent of the president of the United States vested in the state of Missouri a fee simple title to the lands conveyed. Although the act contemplated and provided for the reclamation of the lands, such purpose did not impose a trust upon the state which it might not disregard. Therefore, notwithstanding the provisions of the act, the state was at liberty to use the lands in any manner and for any purpose which it might think fit. *Emigrant Company v. Adams County*, 100 U. S. 61; *Mills Co. v. Railroad*, 107 U. S. 557; *Dunklin Co. v. Dunklin Co. Ct.*, 23 Mo. 449; *Pool v. Brown*, 98 Mo. 675. (2) The act of the legislature of Missouri approved February 23, 1853, donating the lands to the counties in which they lie, did not give to the counties a vested interest in said lands, nor deprive the state of its right to control them. Notwithstanding the donation, the state might thereafter use or direct to be used said lands for any other purpose which it might think proper. *Cannon v. Bent*, 1 Mo. 235; *Hamilton v. St. Louis Co.*, 15 Mo. 3; *Dunklin Co. v. Dunklin Co. Ct.*, 23 Mo. 449; *State v. St. Louis Co. Ct.*, 34 Mo. 546; *Barton Co. v. Walser*, 47 Mo. 189; *School District v. Weber*, 75 Mo. 558; *In re Taxes*, 78 Mo. 596. (3) The subscription of the county of Dunklin to the stock of the Cairo and Fulton Railroad Company, and the conveyance of the swamp lands to satisfy such subscrip-

tion, were authorized by the act of February 24, 1853, secs. 29, 32, Acts, 52–53, p. 122. (4) A vote was not required to be taken. *Dunklin Co. v. Dunklin Co. Ct.*, 23 Mo. 449; *Smith v. Clark Co.*, 54 Mo. 68; *Sturgeon v. Hampton*, 88 Mo. 213; *Spurlock v. Railroad*, 90 Mo. 205; Acts, 1855, p. 323; Acts, 1858–59, p. 320; Acts, 1859–60, p. 88; Acts, 1860–61, p. 60. (5) Assuming further that "may for information" attaches to the subscription as well as to the mode of payment, and that may means must, it is to be presumed that what the law required to be done was in fact done. There is no evidence in the record which rebuts this presumption. *Flagg v. Palmyra*, 33 Mo. 450; *State v. Weatherby*, 45 Mo. 17; *Snoddy v. Pettis Co.*, 45 Mo. 361; *Smith v. Clark Co.*, 54 Mo. 75; *State v. Young*, 84 Mo. 94; *State v. Railroad*, 101 Mo. 121; *State v. Searcy*, 39 Mo. App. 401; *State v. Mackin*, 51 Mo. App. 309. (6) If it be granted that the subscription of the county court was originally void by reason of its failure to consult the taxpayers of the county, yet the legislature, having supreme power and authority with respect to the counties and their swamp lands, has ratified and approved the subscription and transfer of lands. Acts, 56–57, p. 271; Acts, 65–66, p. 207; Acts, 68, p. 92; *Barton Co. v. Walser*, 47 Mo. 200. (7) The decision in the case of *Dunklin County v. County Court* declared a rule of property, which should be respected and followed whether it be good law or not. *State v. Miller*, 50 Mo. 133; *State v. Clark Co.*, 54 Mo. 70, 74; *Pool v. Brown*, 98 Mo. 683; *Gelpcke v. Dubuque*, 1 Wall. 175; *Havemeyer v. County*, 3 Wall. 294; *Bank v. Kroop*, 16 How. 382. *Farrior v. Mortgage Co.*, 12 L. R. A. 856, and cases cited. (8) The railroad company had the right under its charter to receive and hold swamp lands to aid in its construction. *Land v. Coffman*, 50 Mo. 243. (9) If the court find the subscription of the

county court valid under the twenty-ninth section of the act of 1853, the fact that the patent of the governor recites the act of December 7, 1855, will not invalidate the patent. *Chouteau v. Allen*, 70 Mo. 327. (10) The plaintiff is barred from the relief asked by reason of its laches. The lands in controversy were conveyed to the railroad company April 20, 1857. This suit was brought in 1890, thirty-three years after. In the meantime the records of the county court have been destroyed by fire (1872); most of the persons having knowledge of the facts have died, and very important rights have been innocently acquired. Moreover the county has been receiving taxes assessed against the defendant and his grantees, and by its conduct and compromises has led Mr. Chouteau to incur vast responsibilities and to disburse large sums of money in the protection of his lands and title. *Smith v. Clay*, 3 Bro. Ch. 638; Pom. Eq. Juris., secs. 419, 420; Bispham's Eq. Jur., sec. 39; *Railroad v. Marion Co.*, 36 Mo. 294; *Bliss v. Prichard*, 67 Mo. 181; *State v. Polk Co.*, 68 Mo. 229; *Kline v. Vogel*, 90 Mo. 239; *Stamper v. Roberts*, 90 Mo. 683; *Schradski v. Albright*, 93 Mo. 43; *Burgess v. Railroad*, 99 Mo. 496; *Brown v. County*, 95 U. S. 157; *Boone v. Railroad*, 139 U. S. 684. (11) The plaintiff is barred by the statute of limitations. The Cairo and Fulton Railroad Company acquired the legal title to the lands under the patent of the state dated April 20, 1857. Seisin follows the legal title, and where the lands are unoccupied swamp lands, constructive possession is in him who has the seisin. *Bradley v. West*, 60 Mo. 33; *Myler v. Hughes*, 60 Mo. 105; *Douthitt v. Stinson*, 63 Mo. 268. A right of entry having accrued to the plaintiff prior to the statute of 1865 (Gen. Stats. 1865, p. 706, sec. 7), it can not invoke the exemption, for the first time made by that statute. *Ins. Co. v. St. Louis*, 98 Mo. 422; *Miss. Co.*

*v. Vowels*, 101 Mo. 225. The petition contains a count in ejectment. It is not necessary to plead the statute. *Stocker v. Green*, 94 Mo. 280; *Bird v. Sellers*, 113 Mo. 580. (12) By the compromise deeds made in 1884, 1888 and 1889, the defendant acquired a good title to the lands. Acts, 1857, p. 32; Acts, 1869, pp. 66, 67; R. S. 1879, secs. 6200, 6205; *Linville v. Bohanan*, 60 Mo. 554; *Mitchell v. Nodaway Co.*, 80 Mo. 264; *Prior v. Scott*, 87 Mo. 303; *Pool v. Brown*, 98 Mo. 675, *Railroad v. Hutton*, 102 Mo. 55.

BLACK, P. J.—The county of Dunklin brought this suit in 1890 against Charles P. Chouteau to set aside a patent professing to convey one hundred thousand acres of swamp lands to the Cairo and Fulton Railroad Company; to vacate two orders of the district county court, upon which the patent is based; and to vacate three compromise deeds from the county to the defendant. There was also a count in ejectment. The trial court dismissed the bill and the plaintiff appealed, so we are to consider the equity branch of the case only. The bill contains numerous charges of fraud, but there is no evidence to support any of these charges, and they need not be noticed.

The record discloses the following facts: The acts of March 3, 1851, and February 23, 1853, donated the swamp lands, which the state acquired by the act of congress of September 28, 1850, to the counties in which the lands were situated, giving to the county courts power to reclaim the lands and to that end to sell them in the manner pointed out in the act of 1851. Under these acts, Dunklin county acquired about four hundred thousand acres. The Cairo and Fulton Railroad Company was organized in January, 1854, under the general railroad law passed on the twenty-fourth of February, 1853. Laws of 1853, p. 121.

On the first of March, 1855, the legislature passed an act (Laws, 1855, p. 474) creating a district county court for the counties of Stoddard, Dunklin and Butler, and providing that the court thus created "shall possess all the powers and perform all the duties that the respective county courts now possess, or may perform, in said counties." This district county court is therefore to be deemed a county court. It may be stated here that it was abolished by the act of the tenth of January, 1857, as to the counties of Dunklin and Butler, and the county courts reinstated.

An act was passed on the seventh day of December, 1855 (Local Laws of 1855, p. 353) enabling eight or nine counties, Dunklin being one of them, to transfer swamp lands to the Iron Mountain or Cairo and Fulton Railroad Company. It provides that, "whenever a majority of the voters of either of said counties shall petition the county court of their county, it shall be lawful, and is hereby made the duty of said court, to enter an order upon their record transferring" alternate portions of said lands to either of said companies, the order to be certified to the governor, who shall issue a patent to the company. This act also provides that the land shall not be transferred at a rate less than $1 per acre, payable in stock of the company, the stock and accruing interest thereon to be used for the sole purpose of reclaiming swamp lands.

On the eighteenth of December, 1855, a petition, signed by twenty-four persons representing themselves to be citizens of Dunklin county, was presented to the district county court, asking that court to make a subscription to the stock of the Cairo and Fulton Railroad Company, and in payment therefor to transfer to the company swamp lands. On the same day that court made the following order:

"On motion and being fully satisfied that the same

will conduce to the interest of the citizens, generally, of this county, it is now here ordered and directed by this court that the sum of $100,000 be subscribed by the said county of Dunklin to the capital stock of the Cairo and Fulton Railroad Company of the said state of Missouri, and that George W. Mott be, and he is hereby appointed to make such subscription in due and proper form, and it is further ordered that alternate sections of the swamp and overflowed lands owned by and commencing on the northern boundary thereof and extending thence southwardly belonging to the said county of Dunklin, be sold, transferred, conveyed and set over by deed or deeds in due and proper form at $1 per acre, to an amount sufficient to meet and fully pay off said subscription upon the execution by the said company of a certificate or receipt therefor in proper form through its duly authorized agent as in other cases of stock subscriptions where payment is made in advance, the same to bear interest at six per cent. per annum from the date of said transfer."

Thereafter and on the eighteenth of March, 1856, the agents of the railroad company filed in that court their report of the lands selected. This report was approved by the court on the twenty-first of the same month. The order of approval also directed Mott to execute proper deeds to the company.

As bearing on the validity of the order of the eighteenth of December, 1855, the evidence discloses these further facts: The twenty-four persons signing the petition did not constitute a majority of the voters of the county. It does not appear by any direct evidence whether a vote of the taxpayers was ever held or not, but the fair inference from all the evidence is that no such election was held. The courthouse of Dunklin county was destroyed by fire in 1872, and all records of the county and circuit courts were consumed.

The road was never projected or constructed so as to pass through Dunklin county or nearer than four miles.

In two or three months after the date of the order directing Mott to execute deeds to the company, Nathaniel G. Murphy, superintendent of public works of Dunklin county, commenced a proceeding in the supreme court to compel the district county court to vacate the order of the eighteenth of March, 1855, but the supreme court refused a peremptory writ on final hearing. The details of that proceeding will be noticed hereafter.

It does not appear that Mott ever executed a deed to the railroad company, but certified copies of the order of the district county court and the approved report of the selection of the lands were filed in the office of the secretary of state on the first of April, 1857; and on the twentieth of that month the governor executed a patent, reciting therein the order of the district court of date the twenty-first of March, 1856, and stating that the order was made pursuant to the act of December 7, 1855, and conveying the one hundred thousand acres to the company. A certificate for four thousand shares of stock was issued to the county by the company in July, 1858.

On the twenty-third of May, 1857, the Cairo and Fulton Railroad Company conveyed the larger portion of the lands thus acquired to trustees to secure a large number of bonds issued by the company to raise money to build the road. The company also made a supplemental deed of trust for the same purpose in 1858. The defendant held a large number of these bonds. Default having been made in the payment of them, he commenced a suit to foreclose the first deed of trust. This foreclosure suit was commenced in 1871, and he obtained a decree of foreclosure in 1882, and under that decree became the purchaser of eighty-six thou-

sand, three hundred and fifty acres, and received a deed dated the second of November, 1882. The supplemental deed of trust was foreclosed at a later date, and under that decree he acquired another portion of the lands.

It appears Dunklin county sold to various persons some of the lands purchased by defendant. In view of this state of affairs, the county court made the defendant Chouteau a proposition of compromise, which proposition he accepted. In execution of this compromise Chouteau released to the county nine thousand, six hundred and eighty-two acres, and the county released to him sixty-three thousand, six hundred and twenty-eight acres. These deeds of release were executed in January, 1884. Another compromise was made in 1888 as to lands acquired by Chouteau under the foreclosure of the supplemental deed of trust, and pursuant to this compromise he released to the county three thousand, three hundred and ninety-two acres, and the county released to him one thousand, six hundred and forty-three acres. A further deed of one hundred and sixty acres was made to Chouteau in 1889, to correct a mistake in a former deed. These compromise deeds to Chouteau were not executed by the presiding judge of the county court, but were all executed by commissioners appointed by that court. The county now claims that these compromise deeds were made in violation of then existing laws, and were without consideration.

1. It will be seen from the foregoing general history of this case that the defendant's title to the lands rests upon the following orders, proceedings and conveyances: The order of the district county court, made on the eighteenth of December, 1855, subscribing $100,000 to the stock of the Cairo and Fulton Railroad Company, the stock to be paid for by a transfer

of swamp lands at $1 per acre; the patent from the governor to the railroad company, dated the twentieth of April, 1857; the deed of trust from the railroad company to the trustees to secure the bonds of the company, dated the twenty-third of May, 1857, and the supplemental deed of trust; the purchase of the lands by the defendant under the decrees foreclosing the same deeds of trust; and the compromise deeds of 1884 and 1888. It is the above mentioned order of the district county court, the patent and compromise deeds, which the plaintiff seeks to set aside.

There can be no doubt but the defendant acquired all the title which the railroad company had or could convey, and this, too, without any regard to the compromise deeds. If he acquired a good and valid title from the railroad company, then the validity of the compromise deeds need not be considered. The claim now made for the county is, that no title passed to the railroad company; that the order of the district county court was, and is, void—void under the special act of the seventh of December, 1855, because the petition was not signed by a majority of the voters, and void under the general railroad law, because made without a vote of the taxpayers.

The special act of the seventh of December, 1855, made it the duty of the district county court, when requested by a petition signed by a majority of the voters of the county, to subscribe for stock in the Cairo and Fulton Railroad Company, and in payment therefor to transfer swamp lands to the company. The petition presented to that court was not signed by a majority of the voters of the county. Indeed, the twenty-four persons signing the petition do not appear to have signed it as voters, but simply as citizens of that county. The order made by the court does not even profess to be made pursuant to any petition, or

under the special act. As the defendant disclaims, and, it seems, has always disclaimed any reliance upon this special act, we need say no more in respect of it.

We come, then, to the general railroad law passed in 1853, under which the Cairo and Fulton Railroad Company was organized. The twenty-ninth section (being sec. 30, p. 427, 1 R. S. 1855) provides: "It shall be lawful for the county court of any county, and the city council of any city, to subscribe to the capital stock of any railroad company duly organized under this or any other act in this state; and the county court or city council subscribing, or proposing to subscribe, to such capital stock, may, for information, cause an election to be held, to ascertain the sense of the taxpayers of such county or such city as to such subscription, and as to whether the same shall be paid by issues of county or city bonds, as the case may be, or by taxation." Sections 31 and 32 provide for the levy and collection of a special tax to pay the subscription, and give to the taxpayers the right to convert· tax receipts into stock. Section 33 provides: "Any county subscribing for railroad stock which shall have internal improvement funds, or overflowed or swamp lands, granted to it by the state, may apply such funds, or mortgage or sell such overflowed or swamp lands, to pay such subscription, or any part thereof, and provide for the remainder, if any, by the tax, as aforesaid."

The claim of the plaintiff is that the words "may for information" in section 29, mean shall for information, and hence a subscription to the stock of the railroad company could only be made pursuant to a vote of the taxpayers. Section 29 was amended in 1860 so as to read, "shall for information," and in 1861 it was further amended, so as to make a majority vote of the qualified voters a condition precedent to making a sub-

scription. Still it was held in *Railroad v. County Court*, 42 Mo. 175, that *may* as used in section 29 before either of the amendments meant *shall*, applying the general rule that "may" should be construed to mean "shall," when the public is interested and the public or third persons have a claim *de jure*, to have the power executed. That case was cited in several subsequent cases, but the exact question was not involved in any of them. On the other hand, it was said by Judge NAPTON in *Smith v. County of Clark*, 54 Mo. 68, that before the amendments the law did not require an election. That observation has been approved by way of argument in some subsequent cases. The real point, however, in the *Smith case* was, whether certain provisions of a special charter had been repealed by the acts of 1860 and 1861.

The defendant insists that this question must be deemed settled by the case reported under the name of *Dunklin County v. The District Court of Dunklin County*, 23 Mo. 449. In that case Murphy, as superintendent of public works of Dunklin county, applied to this court for a writ of *mandamus* to compel the district county court to vacate the order now under consideration. In his petition he set out the act of congress, the act of this state donating the lands to the counties, and alleged that the subscription to the stock of the railroad company and the conveyance of swamp lands in payment thereof would not tend to reclaim such lands or aid in building levees and drains as contemplated by the act of congress; that such an appropriation of the lands was in direct violation of the trust reposed in the county, and contrary to the wishes of a large majority of the inhabitants thereof; and that the district county court, in making the order, acted without authority of law and against the interest of the citizens of that county. The substance of the return

made by the judge is that he made the order by virtue of the authority vested in him by law and in accordance with the rights granted the railroad company by its charter, and because he believed it to be to the interest of the county.

It was held *mandamus* was not the proper remedy. "But," says the court, "the parties have argued the whole matter, and desire our opinion upon all the questions involved; and as it may be a matter of public interest that our opinion should be known, we shall not withhold it. These questions are, whether, under the several acts of the legislature upon this subject, the district county court had authority to make the sale complained of, and, if the authority was expressly given by these acts, whether it was competent to the state legislature, in view of the trust annexed to the grant, to authorize such a disposition of the property." After citing several acts it is said: "Under the general railroad law of 1851 (Sess. Acts, 1851, secs. 29, 32) the county courts are empowered to subscribe stock, in behalf of their counties, in railroad companies, and when any county has swamp land under the grant of the state, the county court is expressly authorized to sell the same in order to pay its railroad stock subscription; and by the act of December 7, 1855 (Sess. Acts, 1855, p. 353), it is made the duty of the county courts of Dunklin, Stoddard and certain other southeastern counties, whenever a majority of the voters petition them respectively to that effect, to transfer alternate tracts of their swamp lands to the Iron Mountain or Cairo and Fulton Railroad. * * * Under these several statutes, it is manifest that this county court had authority to dispose of the lands as they have done."

The question whether a vote of the taxpayers was essential to a valid subscription under section 29 was

not in terms made in the pleadings in that case, nor was that particular question discussed. It is, however, worthy of note that the court mentions the necessity of a petition signed by a majority of the voters, when speaking of the special act of December 7, 1855, while nothing is said about the necessity of a vote of the taxpayers when speaking of sections 29 and 32 of the general railroad law. One thing, however, is certain, and that is this: This court did, in plain terms, hold that the district county court had the right and power to dispose of these swamp lands as it did by the order now in question. This court then had before it the same proceedings of that court which we have before us by the present record. It was an important suit, and was prosecuted by a county official for the very purpose of procuring the judgment of this court as to whether the county court had a right and power to make this order. This court said it had. Relying on that decision, the governor issued the patent to the railroad company, and on the faith of it the company made the deeds of trust and the defendant and others invested their money in these lands. In view of these considerations the decision in that case must be regarded as establishing a rule of property, so far as the title to these swamp lands is concerned, and this, too, without disturbing the ruling made in *Railroad v. County Court*, *supra*. That case, it may be observed, did not involve the construction of section 32 of the general railroad law, upon which the validity of the sale of these lands mainly depends. It was the sale of these lands which this court had under direct consideration in the *Dunklin county case*.

Though a vote of the taxpayers may have been essential to a valid subscription, still there is nothing in either section which required a vote to be taken upon the question whether the subscription should be paid,

in whole or in part, by a sale of swamp lands. A subscription having been duly made, the question whether swamp lands should be sold to pay the subscription, was one left to the discretion of the county court. Whether the power to subscribe for stock and the power to use the lands in payment for the stock are so far independent of each other that a sale of the lands to the company would be valid, though no vote as to the subscription had been taken, presents a question which we need not consider on this appeal. We say this because this court held the very sale now in question valid. That decision was pronounced over thirty years ago. It thereby established a rule of property which has been acted upon during all that period of time, and as to these lands it ought to be followed, whether in our opinion the judgment then rendered is right or wrong. In no class of cases is the rule of *stare decisis* more rigidly adhered to than in cases which concern the title to real estate. *Reed v. Ownby*, 44 Mo. 204. The recent case of *Wilson v. Beckwith*, 117 Mo. 61, is not at all in conflict with what we have said in this one; for there we considered the case then in hand wholly unlike the cases pressed upon our attention. Here the facts concerning the validity of the order of the district county court are in all material respects the same as in the prior *Dunklin county case*.

The act of the twenty-seventh of February, 1857 (Acts of 1856–1857, p. 271), not before mentioned, is, in our opinion, worthy of some consideration in this connection. It provides that whenever the county courts of four designated counties, Dunklin being one of them, shall be satisfied that full payment has been made for any lands sold as swamp lands, they shall cause a patent to be issued to the purchaser. It is then provided that the patent shall be signed by the president of the court. It is also made the duty of the governor to

cause a list of the swamp lands in each county to be made out and certified to the clerk of the county court; and section 6 provides: "This act shall not apply to lands granted by the counties to the Cairo and Fulton Railroad." The effect of this act was to take the one hundred thousand acres sold to the railroad company out of the list of swamp lands owned by Dunklin county; for it is not claimed that the county sold to the company any other lands than those now in question. This act is therefore at least a recognition by the state that Dunklin county had sold these lands to the company. The value of this recognition by the state lies in the fact that though the state donated the lands to the counties by the acts of 1851 and 1853, and by subsequent acts vested full title in the counties, still the state did not thereby divest itself of all control over the lands. The counties still held them subject to the legislative will, to be sold in the manner and for the purposes designated by the laws passed from time to time. *State ex rel. v. County Court*, 51 Mo. 82; *Barton County v. Walser*, 47 Mo. 189; *Sturgeon v. Hampton*, 88 Mo. 204.

2. But let it be conceded that a vote of the taxpayers was essential to a valid subscription and that such a vote was essential to a valid transfer of the lands to the company in payment of the subscription; still it does not follow that the county should have the decree prayed for in this case. We think the county has no standing in a court of equity to question the validity of the sale at this late day. It is well settled that the doctrine of *laches* applies to a county or other municipal corporation, as well as to individuals. *Railroad v. Marion County*, 36 Mo. 295; *State ex rel. v. West*, 68 Mo. 229; *Boone County v. Railroad*, 139 U. S. 684. Care must be taken in applying this doctrine to a county or other municipal corporation. "As experi-

·ence shows that the officers of public and municipal corporations do not guard the interest confided to them with the same vigilance and fidelity thæt characterize the officers of private corporations, the *principle of ratification by laches or delay* should be more cautiously ·applied to the former than to the latter.    But the prin-·ciple applies to both classes of corporations, as well as to natural persons."    1 Dill. on Mun. Corp. [4 Ed.], ·sec. 548.    Distinction must also be made between property held for strictly public purposes, as for streets, ·parks, commons and the like, and property held by the corporation in·its private character. · 2 Dill. on Mun. Corp., sec. 675.    This distinction ·is made in our present ·statute of limitations.    Revised Statutes, 1889, sec. 6772. These swamp lands would not come within the terms of ·that section, and hence the statute of limitations would run in favor of one in adverse possession, even as ·against the county.    Delay on the part of a county ·will not ratify an act of its officers, where the county had no power under any circumstances or condition of things to do the particular act.    Here the county had the power to subscribe for the stock, and it had the power to use the swamp lands in paying for the stock. The only complaint is that the officials did not pursue· the terms of the law.    There is, therefore, no reaso*r* why the doctrine of ratification by delay should *r* be applied ın this case.    The question then is whe' the facts make out such a defense.    ·

This suit was instituted thirty-three years a*ͬ* ·date of the order and patent which the county ·set aside, thirty-two years after the stock wa the county, and thirty years after the sto·ʹ ·on an execution against the county.    Hist was pending in the principal foreclosur*ͬ* eleven years, and then followed the s*ͬ* closure suit.    That all these things v

the county officials can not be doubted.    During all that time vast sums of money were being invested in these lands by the defendant, and he was compelled to pay taxes on them.    Six years before the commencement of this suit the county procured a compromise with defendant whereby it obtained some nine thousand, six hundred and eighty-two acres, and at a later date it procured by a like compromise three thousand, three hundred and ninety-two acres.    No attempt was made to establish any fraud on the part of the defendant, so that he occupies the position of a purchaser in good faith.    No excuse whatever is offered for the long delay and inaction on the part of the plaintiff.    The neglect of the county in asserting its rights in a proper way for so great a length of time, to the continued prejudice of the rights of the defendant can not be excused.    Courts of equity can not and ought not to give relief in such a case.    The delay and conduct of the county is a complete bar to the relief which it now asks, and this is true, though the defendant may not have had ten years' adverse possession of the lands.

3.    It is true the patent recites the act of the seventh of December, 1855, as being the law under which the order of the district county court was made, while the order stands and must stand on the general railroad law.    This misrecital does not make the patent void.    A like question was so ruled in *Chouteau v. Allen*, 70 Mo. 324.    The judgment of the circuit court is affirmed.    BARCLAY, J., absent.    The other judges concur.