## HIMMELBERGER-HARRISON LUMBER COMPANY, Appellant, v. SIMON E. CRAIG.

### Division One, February 28, 1913.

1. **EJECTMENT: Legal Title: Adverse Possession as Defense: Burden.** The record legal title being concededly in plaintiff, the defense carries the burden of proving all the essential elements of an adverse possession of such character as overthrows the legal title, and establishes a paramount outstanding title, or his own.

2. ————: **Adverse Possession.** A possession subordinate and subservient to the true title lacks the element of being hostile and adverse to the true owner.

3. ————: ————: **Claim of Ownership.** A party does not hold adversely to the true owner within the purview of the Statute of Limitations unless his possession is under claim of right as against such owner. Under a claim of ownership he must raise a flag of hostile possession, and maintain it for a sufficient length of time for it to ripen into title. An intent to claim adversely is the principal guide to be relied on to establish hostility.

4. ————: ————: **Against County: Swamp Lands.** On the authority of former decisions and governed by the rule of *stare decisis*, it is assumed that a county .may lose its title to swamp lands, by adverse possession, the same as a private owner.

5. ————: ————: **Claim of Ownership: County's Title Acknowledged by Application for Patent.** When defendant applied to the county for patents to crystallize his squatter's right into a legal title, he thereby solemnly characterized his possession as subordinate to the true title of the county.

6. ————: ————: ————: **Improvements.** Where the arrangement between the county and a contractor to ditch and drain swamp lands, to be paid for in lands, was, that any person in actual possession and who had made improvements might, by proving those facts and paying to the county $1.25 per acre for such contractor, have a patent upon the completion of the work, improvements made by defendant were supposably made in reliance upon the generous disposition of the county to give settlers the preference when patents were to be issued, and are not therefore to be taken as the assertion of a dominant claim hostile to the county, but only as an evidence of his good faith and intention to pay to the county the money when

the time to issue the patent arrived; and having failed to pay the money, his possession will not be held to have been adverse to the county, or to the man who was awarded the patent.

7. ———: Paying Taxes. The payment of taxes is evidence of the existence of a claim of title by adverse possession.

8. ———: Landlord and Tenant: Estoppel. A defendant cannot be put in possession of real estate by the owner of the legal title under a contract creating the relation of landlord and tenant, and then by a change of mental attitude assert the right to hold over under a claim of ownership.

Appeal from New Madrid Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED (*with directions*).

*Oliver & Oliver* for appellant.

(1) Appellant having shown a perfect legal title to the land in question and that the respondent was placed in possession of it in 1905, as the tenant of appellant, defendant could not subsequently set up an adverse holding. Sec. 7885, R. S. 1909. (2) Having shown a perfect legal title to the land in question, and having further shown that defendant entered into the possession of this property as the tenant of appellant, and was in possession at the time of the bringing of this suit, after notice to surrender the possession thereof, appellant was entitled to a judgment against respondent under the ejectment statute. Sec. 2389, R. S. 1909. (3) There is absolutely no testimony in this case showing that this defendant, or either of the Craigs, ever held this land adversely to the appellant or its grantor—the county of New Madrid—until after 1906. This being so, appellant was entitled to judgment at the close of all the evidence, and the court erred in refusing to give the peremptory instructions at the close of the evidence. Feller v. Lett, 225 Mo. 326; Hunnewell v. Adams, 153 Mo. 460; Stevenson v. Black, 168 Mo. 560; Chilton v. Comanianni, 221 Mo. 685. (4) The court should have declared the law as

prayed for in the third declaration asked by appellant. The only claim set up by any of these "squatters" was to the "improvements" on the land. Hunnewell v. Adams, 133 Mo. 443; Bernarde v. McElroy, 110 Mo. 659; Bowman v. Lee, 48 Mo. 335; Hunnewell v. Burchett, 152 Mo. 611.

*Henry S. Shaw* for respondent.

(1) A title acquired by adverse possession not only bars the recovery by the owner of the record title, but extinguishes his title and vests it in fee in the adverse occupant. The title is one in fee simple, and is as perfect a title as one by deed, or patent or grant. When once acquired it continues until conveyed by the possessor or lost by another adverse possession. Boyce v. Railroad, 168 Mo. 583; Long v. Lackawana C. & I. Co., 233 Mo. 713; Adams v. Gossmon, 228 Mo. 566. (2) Color of title need not be a valid title. Any writing which purports to convey land and describes the same is color of title, though the writing is invalid and conveys no title. Allen v. Mansfield, 108 Mo. 343; Brewing Co. v. Payne, 197 Mo. 422. A description though indefinite, is sufficient if the court can, with the aid of extrinsic evidence, which does not add to, enlarge, or in any way change description, fit it to the property conveyed by the deed. Thornton v. Railroad, 40 Mo. App. 265; 1 Cyc. 1091. (3) A trespasser without any shadow of title who enters upon land and holds adversely to the true owner for ten years will become the owner, at the expiration of that period. Wilkerson v. Eiler, 114 Mo. 245; Bushey v. Glenn, 107 Mo. 331; Boyce v. Railroad, 168 Mo. 583; Quick v. Rufe, 164 Mo. 408. (4) Though the law confines one whose entry is initially wrongful to such part of the land of which he actually holds possession, yet such possession will include all that is used as an adjunct or necessary to the enjoyment of that actually cultivated

and will be estimated by natural or legally established boundaries. County v. Vowells, 101 Mo. 225; Bonsor v. County, 204 Mo. 84; Nall v. Conover, 223 Mo. 477. (5) The Statute of Limitations runs against the county as well as against individuals except where it holds property for public, pious or charitable uses. R. S. 1909, sec. 1886; County v. Chouteau, 120 Mo. 577; Nall v. Conover, 223 Mo. 477. (6) There is no estoppel in this case, because the very fact that the county court excluded lands claimed by others from the patent to the lands conveyed to Himmelberger was notice to him that there were adverse claimants to and occupants of many tracts of these lands, hence he bought with his eyes open. If Mrs. Craig's title to the land in suit had ripened into a perfect title by limitation, she deceived no one and defrauded no one by insisting on holding what was hers, without leave or license from the county court or any one else. Tennent v. Ins. Co., 133 Mo. App. 345; Williams v. Butterfield, 214 Mo. 412. (7) Since the court only entertained an application for eighty acres, Mrs. Craig had a perfect right to consummate her title to one eighty-acre tract and to hold the other under adverse possession if she so desired, and no one was defrauded thereby. Mather v. Walsh, 107 Mo. 121. (8) A party in possession of land may fortify his right thereto by acquiring any outstanding interest therein, without thereby weakening the force or effect of his possession. Mather v. Walsh, 107 Mo. 121; Finlay v. Babb, 173 Mo. 257.

LAMM, J.—In July 1907, plaintiff sued in ejectment for eighty-acres, viz., the southwest quarter of the northeast quarter and the northwest quarter of the southeast quarter in section 18, township 22, range 11, New Madrid county, on what is known as "a ditch title," laying ouster as of January 1st of that year.

*The pleadings.* The petition was conventional. Defendant answered by general denial, modified by the averment that he and those under whom he claims have been "in open, notorious and adverse possession of the premises in plaintiff's petition described for more than thirty years."

The replication put in issue the fact of adverse possession under a claim of title as against the legal owner, and further pleaded the existence of a certain Luce contract, whereby Luce purchased the land in question with a great body of other swamp land from New Madrid county, in consideration of doing certain reclamation work, which contract was renewed with the Luce heirs and contained a provision whereby actual settlers might make application for the land which they had improved in the swamps to the extent of eighty-acres, and by proving certain facts might obtain a patent therefor by paying in for the benefit of the Luce heirs $1.25 per acre, the contract price to them; that the Craig family made applications under that contract and had land assigned to them in some instances; that defendant (a member of that family) made an application for other land which was denied. That these things happening in 1899, the Craigs (including Simon) thereby recognized the legal title was in New Madrid county and that plaintiff's grantor was entitled to and received the proceeds of the land in section 18 patented to the Craigs. Thereupon plaintiff's grantor, having fully performed the reclamation contract, at the same time received a patent for the residue of section 18, including the land in dispute. That in the adjustment thus made the Craigs (including Simon) admitted themselves squatters and as not asserting any adverse possession; that plaintiff's grantor bought in good faith for value without any knowledge of defendant's claim and in 1903 plaintiff went into peaceable possession; that thereafter it put defendant in possession under an arrangement

(amounting to a tenancy); that thereafter defendant, repudiating such arrangement, attempted to hold possession against plaintiff's will. Wherefore estoppel is pleaded.

At a trial to the court without a jury, the judgment gave one forty to plaintiff, the other to defendant. Defendant abides. Plaintiff appeals.

*The facts*:

The legal title of record is in plaintiff. It passed out of New Madrid county to one Himmelberger in 1899, and through mesne conveyances to plaintiff in 1902. Defendant has no record title whatever, but claims through adverse possession. The whole of section 18 was swamp land, as was much other land in New Madrid. The title thereto, as a matter of history, emanated from the general Government to the State in the fifties and was by the State granted to the respective counties in whose borders the swamp land lies. In 1885 New Madrid county, as it had a right to do, made a contract with one Luce to do certain reclaiming work in ditching, and take his pay in swamp lands, including section 18, at $1.25 per acre. While there is some comment on the fact that this contract disposed of a "principality" yet its validity is conceded. Luce dying before full performance, that contract was renewed with his heirs and Himmelberger became interested therein. It seems that from an early date, maybe ever since the earthquake, hunters and trappers now and then went out into these swamps, sometimes built cabins, sometimes made clearings, called locally "openings," and lived there, either at all times or at spells, plying their venturesome and primeval vocation, and sometimes raising crops about their cabins to subsist upon. In the apt language of the country, harking back to pioneer times for the tang of it, such cabin and clearing was called "a claim," "an improvement," "a possession." Sometimes these claims were "jumped." Sometimes a

squatter sold what he called "his right to possession" or "possession"—all of which bargaining was seemingly regulated by local usage, a kind of "breast law," if we may borrow a phrase from Manx jurisprudence.

Realizing the practical difficulties of the situation, with its possible attendant equities, to deal tenderly with those who had such "claims" on county lands (as these swampy lands were) the Luce contract provided *inter alia*, as follows:

"It is further agreed that any persons who are now in the actual personal possession of any of the lands, the legal title to which is now in New Madrid county, and who have made improvements, and are now residing thereon, shall have the right to purchase said lands, at the time the same are patented or conveyed to the parties of the first part, their heirs, executors, administrators or assigns, at and for the price of one dollar and twenty-five cents per acre; but this provision shall only apply to improvements made at this time, and shall in no event entitle any such person to more than eighty acres."

At a certain time in 1899 full performance was claimed under the Luce ditching contract. Thereat the question of issuing a patent for such performance together with the matter of adjusting the claims of those persons "now in actual possession of any of the land" and issuing a patent to them on the payment of the entry price for the use of the ditch contractors, came to a head. Accordingly at that time the Craigs took advantage of the Luce contract to make application for certain lands, and sought the privilege of paying in the purchase price for the benefit of the contractors and receiving a patent for lands they might prove up under the terms of the contract, and which, by the contract, the county had bargained away to the Luces and their assigns.

Before setting forth the adjustment made at that time, it is well enough to go back a little and bring

down another thread of the story—a story in its be-
ginning by no means green. In 1868 one Baker and
one Beckwith, hunters both, penetrated the swamp
covering section 18, ran up a "bark shanty," and
deadened some trees. In the words of one of defend-
ant's witnesses: "They put some poles across and
roped them and covered them with sweet gum bark."
Their habitation for the first winter amounted to no
more than "a roof," and (quoting) "the next fall they
made a pole house and used leaves." As we gather,
about 1878 a Mr. Glover took over this "possession."
What became of Baker and Beckwith, and the charac-
ter of their occupation or "improvement," is dark.
Mr. Glover's father joined him and the two made
some "improvements," building a fence, doing some
clearing and living there. "It was just a wild woods"
and the Glovers had "only a little shanty." After
ten years they sold to Hazel by word of mouth and
he moved in. Presently, in 1887, Hazel sold his "pos-
session" or *claim* to John L. Craig, the paternal ances-
tor of defendant Simon. The form of this transfer
was a quit-claim deed whereby Hazel and wife con-
veyed to said Craig by the following description: "All
of a certain improvement and premises known as the
Glover farm lying and situate about two miles south-
east from the old Brooke Mill site, containing fifty
acres of improved land, together with all the buildings
and fencing." The deed further described the premises
as "situate in the county of New Madrid, State of
Missouri." This instrument, for an expressed con-
sideration of $500, was acknowledged and delivered
but never recorded. John L. Craig took possession
under it. He seems to have come into New Madrid
from Dunklin, and whether he knew aught of the Luce
contract, then two years old, does not appear. De-
fendant put said instrument in evidence for the pur-
pose of showing color of title. Craig's family con-
sisted of a wife and children. At an unnamed time,

after enlarging the area of cleared land and planting
an orchárd, he died and some of his children died.
In 1899, when the county was about to adjust its
swamp land matters and issue patents under the Luce
contract, as heretofore pointed out, there were living
on the premises Mr. Craig's widow, Susan; and two
or three of his boys were living with their mother or
in the vicinity—one of them, John D., a minor. The
plan adopted for getting patents to what they claimed
was this: Susan applied for the eighty acres, by de-
scription, lying west of the eighty in dispute and co-
terminous with it. She filed her claim "as an actual
settler," "in possession." She enumerated the im-
provements as "one dwelling house, barn, out build-
ings and forty acres cleared land in cultivation and
other improvements of the value of $500," and ap-
plied under the provision of the Luce contract for the
privilege of paying in $1.25 per acre and taking a
patent. Another son, William, applied for forty acres
elsewhere in the section. Defendant Simon, another
son, applied for eighty acres in "range 10," which he
claimed he had in possession and upon which he as-
serted he had made improvements of the value of
$150. He asked to enter that, pay the entry price and
get a patent. The same attorneys represented all
these Craig claimants and (evidently as the result of
a family council) petitioned for the lands in writing,
making such demands as they concluded had sub-
stance. Evidence was heard and Simon's claim was
rejected, but Susan's and William's were allowed and
patents issued to them for the land they respectively
claimed. As the result of these hearings and this
adjustment, a patent also issued to plaintiff's grantor
for the residue of the land in section 18, including
the eighty in dispute, and plaintiff's grantor received
the money paid in by William and Susan in lieu of the
land they received.

Coming down to 1902 or '3, at the time one Dixie

Wells bought the eighty patented to Susan, the situation, we take it, was this: The lines had not been run through the swamps and were not known with accuracy. When they were run presently, it was found that the old log house, in which the Craigs had been living as their family residence, fell a little east of the land patented to Susan; i. e., on the eighty in dispute. It seems the barn also fell east of the line. There was a "box shanty" on the eighty patented to Susan. When it was built is dark. In that box shanty Simon lived at the time Dixie Wells purchased. Another son, Lee, who afterwards died, had been living in the family residence, and had some trivial household goods there. By the subsequent survey, a great portion of the clearing was found to be on the eighty patented to Susan, but ten acres or so of it spread over on the eighty in dispute and there were some old apple trees on that eighty. The mother (at this present time) had moved to a nearby village, Malden. There was a son, John D., as said, not yet of age, who by some family arrangement asserted a "claim" on one forty of the eighty patented to his mother—the nature of which is undisclosed.

In this situation of things one Dixie Wells got deeds to the mother's eighty from Susan and John D. (from the latter when he attained his majority). Dixie testifies that, as part of the bargain, he got the whole "claim" of the Craigs and their whole "possession" for one thousand dollars paid down presently. There is some dispute whether the entire "claim" and "possession" were sold and passed for said purchase price, and some testimony that the mother wanted a cow thrown into the trade as a consideration for parting with her whole "claim" and "possession," and some that Dixie "laughed" at her bovine suggestion. There is also some testimony that the mother was to pay Simon and another son $50 apiece as their shares of the $1000 she got by the

sale. Be that as it may, their minds met finally, the transaction was an amicable one and to all appearances seemed final and ended their possession. Accordingly when Dixie bought, the Craigs one and all moved away at once with all their belongings and surrendered to him full possession of the whole clearing and all buildings. Under the purchase, the lines not being yet accurately established, as said, he took possession of it all precisely as the Craigs held it, including the former log residence and the adjacent cultivated land on the eighty in dispute. He at once put a tenant in possession and thereafter farmed the entire clearing for two years or so without protest from any source. He then sold and conveyed, by the description in his own deeds, to a Mr. Stokes. As we get it, the lines had then been run and both Stokes and Wells recognized and conceded that ten acres or so of the clearing, the log house and some apple trees were in fact on plaintiff's eighty and belonged to plaintiff. Presently after that sale, by the act of plaintiff and Stokes, operating through Wells, in order to keep the premises (both eighties) occupied, an arrangement was made with defendant Simon to move there and hold them for the owners under a cropping arrangement in the nature of a tenancy. Simon, who had been away for several years, living here and there, at that time lived in a tent on the edge of the swamp at "ditch number three," some distance away. In pursuance of that contract and not otherwise, he moved from his tent on ditch number three into his mother's former residence and took up the performance of his cropping agreement. After a season or so there he conceived the idea of repudiating the arrangement by which he got possession, and of asserting his own right to the possession abandoned when Wells bought. Accordingly, on notice from plaintiff to quit at the end of his time, he refused to go, and this suit was brought.

Plaintiff had paid all taxes save one year (on

which there was no proof); defendant has paid none.

Defendant, though in court, did not testify.

Such are the salient facts as near as we can make them out from a record a little obscure in some incidental features.

On such record, plaintiff should have recovered both forties on the strength of its record title. This because:

The record legal title being concededly in plaintiff, defendant carried the burden of proving his defense, viz., all the essential elements of an adverse possession of such character as overthrew Adverse Possession. the legal title and established a paramount outstanding title, or his own. A possession subordinate and subservient to the true title, a friendly one, lacks the element of being hostile and adverse to the true owner. Nor does a party hold adversely to the true owner within the purview of the Statute of Limitations unless his possession is under a claim of right as against such owner. Under a claim of his own, he must raise the flag of hostile possession and, planting himself under its folds, keep it flying through such effluxion of time as ripens into a title by adverse possession. [Feller v. Lee, 225 Mo. l. c. 326-7, and cases cited; McCune v. Goodwillie, 204 Mo. l. c. 339, and cases cited; Bowman v. Lee, 48 Mo. 335; Wilkerson v. Eilers, 114 Mo. 245.] This proposition is frequently illustrated in disputes over party lines where one party holds merely subject to the final establishment of the true line.

If the question was *res integra*, something of substance could be said against the doctrine that the title of a county to its swamp lands could ever be lost by mere adverse possession. In 1866 there was enacted a law exempting lands granted "to any public, pious or charitable use" from the provisions of the Statutes of Limitations. [R. S. 1909, sec. 1886.] The broad definition of a

Against County: Swamp Lands.

charity, in Missouri Historical Society v. Academy of Science, 94 Mo. 1. c. 466, might have been construed to apply to grants to counties of swamp lands, by interpreting the grant of them by the General Government and State as for the "benefit or amelioration of the condition of mankind," or as one "for the public convenience," hence, in a broad sense, a charity under the definition in that case.

But the question is not an open one, and as our decisions in that behalf constitute a rule of property, the doctrine of *stare decisis* should be applied with rigor. In the administration of real estate law, we should "stand *super antiquas vias, stare decisis.*" [WHELPLEY, J., in Adams v. Ross, 30 N. J. L. 1. c. 513.] This court has held that the statute referred to does not apply to swamp lands, and that the ownership of the county of such particular lands is subject to the ordinary ills and vicissitudes of private ownership of lands—among them, the danger of losing such lands by adverse possession. [Hunter v. Pinnell, 193 Mo. 142; Palmer v. Jones, 188 Mo. 163; Dunklin County v. Chouteau, 120 Mo. 577.]

Assuming the law to be as just announced, yet possession to be effective must be adverse in the stringent sense heretofore pointed out. We do not think that of defendant and those under whom he claims was of that character. When the Craigs applied for patents to crystallize their squatter's rights into a legal title, they, by that act, solemnly characterized their possession as subordinate to the true title of the county. Not only does that admission stand against them but there is nothing in this case to show that their prior possession was intended as hostile to the county. The *intent* must be held the principal thing and guide the acts relied on to show hostility. [Long v. Coal & Iron Co., 233 Mo. 1. c. 740.] In dealing with swamp lands the county of New Madrid had adopted the policy of giving reasonable protection to

actual settlers by granting patents to them on payment of the legal rate per acre. It is not at all insupposable that the improvements made in the swamp by the Craigs were made in reliance on the generous disposition of the county to give settlers the preference when patents were to be issued on payment of the price of the entry. Under the state of the proof, it would seem that was the attitude of the Craigs, summed up in: No entry money, no land. The mere fact of making improvements, therefore, under the peculiar circumstances of this case, is not to be taken as the assertion of a dominant title or claim hostile to that of the county, but only as evidence of the settler's good faith in reliance on the county's benevolent disposition to deal fairly by him and take his money when the time comes for the title to pass out of the county. What happened in this case is in line with that hypothesis.

We are of opinion, furthermore, that on this record estoppel was well pleaded in favor of plaintiff and should have been given effect. Look at it. This defendant stood by, permitted the patent of the county
Estoppel.    to issue to plaintiff's grantor for the land in dispute without lifting a finger of protest, and to be received as so much payment on money due plaintiff's grantor. He asserted no title to this land under the Luce contract or otherwise at that time, but did elect to assert his right to other land as an actual settler. In doing so he was not *inops consilii*, but took his position and made his election on legal advice.

Not only so but neither he nor those under whom he claims paid any taxes on the land after the title passed out of the county and the land became taxable.
Taxes.    We do not say the mere payment of taxes creates title or the mere non-payment of them divests title. But we do say that the payment of taxes is evidence of *the existence of a claim of title* by ad-

verse possession. [Turner v. Hall, 60 Mo. 271.] The thirty-year Statute of Limitations. recognizes that element as of significance. [R. S. 1909, sec. 1884.]

Nor are we willing to stand for the proposition that a party can be put in possession of real estate by the owner of the legal title under a contract creating a relation in the nature of that of landlord and tenant, and then by a change in mental attitude assert the right to hold over under a claim of ownership, and have such right allowed in a court of justice in a possessory action by the true owner. May A get possession, as tenant of B and then repudiate B's title and hold over as owner? It is not so written in the law.

**Tenant.**

Our conclusion is that the judgment *nisi* should have been in favor of plaintiff for the recovery of all the land sued for, instead of for one forty, as it was. As plaintiff was awarded no damages on the forty recovered and does not complain of that feature of the judgment, we shall assume it waives the question of substantial rental values and damages.

Let the judgment be reversed and the cause remanded with directions to enter a judgment in favor of plaintiff for the possession of the described eighty acres with nominal rents and damages and a writ of ouster and execution. It is so ordered. All concur.