**CITY OF GAINESVILLE, Plaintiff (Appellant and Cross Respondent),**

v.

**Brenda M. GILLILAND, Defendant and Third-Party Plaintiff (Respondent and Cross Appellant),**

v.

**Roy OVERTURF and Joyce Overturf, Third-Party Defendants (Respondents).**

Nos. 14382, 14392.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 21, 1986.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 23, 1986.

Application to Transfer Denied Nov. 18, 1986.

tions of the litigants are easier understood after a synopsis of the evidence.

By warranty deed executed April 25, 1947, Walter Jayson Smith and his wife, Bealie, conveyed to the City a tract described as:

"All of that part of the Southeast quarter of the Northwest quarter of Section 4 ... lying east of State Highway, Route 'E', containing 13.7 acres, more or less."

The airport's north runway now lies in the above-described tract. A fence, running generally north to south, lies east of the runway.

By warranty deed executed May 16, 1979, Roy J. Overturf and his wife, Joyce, ("the Overturfs") conveyed a 160–acre tract which included, among other land, all of the south half of the northeast quarter of section 4 to these grantees: "W.J. Blisard and Helen Blisard, husband and wife, an undivided one-third interest; Levis M. & Lovice Wallace, husband and wife, an undivided one-third interest; and, Brenda M. Gilliland, an undivided one-third interest."

It is obvious, of course, that the east boundary of the tract conveyed to the City in 1947, and the west boundary of the land in section 4 conveyed to the five grantees in 1979 is, according to the respective descriptions of those tracts, the same line.

W.J. Blisard ("Blisard"), one of the grantees in the 1979 deed, recalled that the fence east of the airport's north runway was in approximately the same location as far back as 1947 or "somewhere along in there."

Explaining how the purchase from the Overturfs came about, Blisard recounted that in the spring of 1979, he learned from Lavis Wallace ("Wallace")[1] that the Overturfs' property was for sale. Blisard testified that he and Wallace went to the Overturfs' property and "looked around" with Roy Overturf.

John E. Price, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, and James E. Curry, Ava, for appellant and cross-respondent.

M. Douglas Harpool, Patrick J. Platter, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for respondent and cross-appellant.

Don M. Henry, Henry, Henry & Henry, P.C., and David H. Dunlap, West Plains, for respondents Overturf.

CROW, Judge.

These consolidated appeals arise from a dispute about ownership of certain land that adjoins an airport owned by the City of Gainesville ("the City"). The area in controversy lies in section 4, township 22, range 13, in Ozark County. The conten-

---

1. Wallace's first name appears as "Levis" on the 1979 deed from the Overturfs, but appears as "Lavis" in the transcript.

According to Blisard, he asked Roy Overturf about the boundary between the Overturfs' property and the airport. Blisard said Overturf responded thusly: "He said that he had had this surveyed three times, and that they fenced it on the line. And I said, 'Where,' we was standing at the gate, and he pointed right down here, he said, 'Right there.' And I said, 'That's good enough for me. That's where I thought it was.'"

Blisard added that when Overturf said, "Right there," he (Overturf) was pointing down the fence line. Blisard's testimony then proceeded:

"Q. [Roy Overturf's] statement was that this fence line is right on the boundary line; is that correct?

A. Yes, sir.

Q. Any other conversations at that time about the property or the property lines?

A. Well, he said he had it fenced on the line, and he had refenced [sic] it, reposted [sic] it and looked pretty good shape to me."

Wallace confirmed that he and Blisard looked at the Overturfs' property with Roy Overturf. Wallace, like Blisard, recalled Roy Overturf stating that the fence east of the north runway "was on the line."

Blisard recounted that at the time he and Wallace inspected the property and conversed with Roy Overturf, he (Blisard) was a licensed real estate sales agent and was working with Goodland Realty, located on the "square" in Gainesville. Brenda M. Gilliland ("Gilliland"), a licensed real estate broker, was the owner of Goodland Realty.

A "Missouri Farm Listing Agreement," dated April 16, 1979, was prepared for the Overturfs' property, and was accepted for Goodland Realty by Gilliland. On the reverse side of the agreement appeared this handwritten notation: "There is a strip along the west side that doesn't belong to anyone but is under fence. New buyer might want to try to claim it by adverse possession."

A contract for the sale of the Overturfs' property was also prepared, carrying the same date, April 16, 1979. It identified the buyer as Blisard, alone. On the reverse side of the contract appeared this typewritten notation: "Seller agrees to transfer any adverse possession rights to buyer by tacking."

Gilliland testified that the notations on the listing agreement and the contract referred to "a small strip immediately behind [the Overturfs'] house," not to any land adjacent to the airport.

Roy Overturf recalled things differently. He testified that he went to Goodland Realty April 16, 1979, to list his property for sale. He recalled that Gilliland and Blisard were there, and that Gilliland prepared the listing agreement. Then, said Overturf, he and Blisard went to look at the property. Overturf denied that Wallace accompanied them.

According to Overturf, he told Blisard that he (Overturf) had had his land surveyed, and that there was a strip on the west boundary, the "airport side," that was disputed. Overturf explained that he informed Blisard that the property had been surveyed three times, and that the surveys had come out "[d]ifferent every time." Overturf quoted Blisard thusly: "He just said if I would swear that that fence has always been there, that he didn't care about the survey marker. He'd get the land anyway."

Overturf recalled that after Blisard looked at the property, they returned to Goodland Realty where, at Overturf's request, the handwritten notation about the strip on the west side was added to the listing agreement. Then, said Overturf, Gilliland began preparing the sale contract. While that was being done, Overturf went to an office in the courthouse where his wife, Joyce, "was selling license plate." Blisard, according to Overturf, brought the contract to Joyce Overturf's office, where Roy and Joyce signed it. Roy Overturf conceded that he probably saw the typewritten notation thereon regarding tacking

adverse possession rights, but he denied knowing what it meant.

Joyce Overturf recalled Blisard bringing the contract to her office. Asked whether she made any statements to Blisard at that time regarding "the boundary line on the west side of the 160–acre farm," Joyce replied, "I did." Joyce explained: "I told him that he knew—I asked him if Roy had told him that the fence was not on our boundary line. And he said, yes, Roy had told him that but it didn't make any difference. And he asked me then, has the fence always been there. And I told him yes."

Gilliland's testimony on cross-examination included this:

"Q. So again, Brenda, at the time of the listing and at the time of the contract, April the 16th, 1979, there was some discussion between you and Mr. Overturf with respect to the discrepancy in the boundary or a problem on the west side of this land; isn't that correct?

A. That's correct."

Joyce Overturf testified that after the contract was signed, but before the sale was closed, she went to Gilliland's office and asked Gilliland "if Joe Bill Blisard had told her that there was—that the fence was not on the property line." According to Joyce Overturf, Gilliland responded by asking whether the fence had always been there. Joyce Overturf recalled answering: "I told her, yes, it had. And she asked me if I would swear in court that the fence had always been there."

The sale was closed May 16, 1979, as shown by the deed to the five grantees mentioned earlier. For convenience, the land described in that deed is henceforth referred to as "the Overturf farm." The purchase price was $76,000.

On December 26, 1979, Blisard and his wife, in exchange for interests in other properties, conveyed their one-third interest in the Overturf farm to Gilliland.

Blisard testified that around "hay cutting time" in 1980, which he said was "maybe June," he was on the former Overturf farm and saw a surveyor on the south side of the property. Blisard talked to the surveyor. Then, said Blisard: "We drove downtown to Brenda's and told them that they was surveying up at her property, she ought to see about it. That they said there was a dispute up there, and it's news to me."

Wallace testified that Blisard showed him the surveyor's stakes in June, 1980, and that this was his first knowledge of a possible dispute over the location of the west boundary of the Overturf farm. Wallace remembered Gilliland being there when he viewed the stakes.

Gilliland confirmed that she saw the stakes in the summer of 1980, and that this gave her cause "to believe there might be a question as to the boundary line." Consequently, said Gilliland, she went to see the Overturfs and inquired whether the fence was on the line. Asked what their response was, Gilliland testified: "They told me, yes, it had been surveyed three times and had always come up within a foot of the same line."

After talking to the Overturfs, Gilliland had an attorney prepare a document captioned "Special Warranty Deed." This instrument recited that the Overturfs, for ten dollars "and other valuable considerations," did "convey, transfer and sell" to Gilliland a part of the southeast quarter of the northwest quarter of section 4 described thusly:

"Beginning at the SE corner of the SE ¼ NW ¼ and run thence North 1320 feet, more or less, to the NE corner of the SE ¼ NW ¼, thence in a Southwesterly direction 430 feet, more or less to County Road, thence in a Southerly direction 990 feet, more or less, along the existing fence line to the South line of the SE ¼ NW ¼, thence East 330 feet, more or less along the South line of said forty to the point of beginning, containing 9 acres, more or less.

The West boundary of said tract of land being the now existing fence along the East boundary of the airport property."

At Gilliland's request, Blisard, a notary public, took the above-described document,

henceforth referred to as "the special warranty deed," to the Overturfs on August 22, 1980, for execution. They signed it, and it was recorded the same day. The circumstances surrounding the signing are discussed *infra*.

It is manifest, of course, that all of the land described in the special warranty deed lay within the 13.7 acre tract conveyed to the City by the 1947 deed from Walter and Bealie Smith, and that none of the land described in the special warranty deed lay within the legal description of the Overturf farm.

On September 22, 1980, Wallace and his wife, pursuant to a three-way agreement with Blisard and Gilliland, conveyed their (the Wallaces') undivided one-third interest in the Overturf farm to Gilliland. The land described in the Wallaces' deed to Gilliland did not include any of the land described in the special warranty deed of August 22, 1980, from the Overturfs to Gilliland.

The reason for the survey activity in the summer of 1980 is not clear from the record. We do learn, however, that "during the latter half of 1980 and on into ... the first half of 1981," some individuals desiring to build a nursing home talked with Gilliland about purchasing five acres in "the area adjacent to the north runway and on [Gilliland's] side of the fence line." Although the transaction never eventuated, a purchase price of $40,000 was discussed.

The next significant event occurred in January, 1981. Gilliland testified she went to the property to feed some cattle she had there, and she saw "survey markers." She immediately telephoned the City's mayor, Bob Sullivan, and inquired whether he knew who had done the surveying. Asked how he responded, Gilliland replied: "He told me, yes, he did. The City had surveyed—had ordered it surveyed."

Mayor Sullivan's testimony on this point was:

"We had—I just had got word that the fences and everything wasn't on the property line and that there was a dispute over the property line of the airport.
Q. Who did you get word from?

A. I believe, I'm not certain, but I believe Kelley Sallee. At the time I believe he was County Treasurer.
Q. And you ordered a survey to be made.
A. Yes, sir."

On March 14, 1981, the City commenced this litigation by filing a quiet title action against Gilliland. The amended petition, on which the cause was tried, pleaded that the City owned the land described in the 1947 deed from Walter and Bealie Smith, and that Gilliland claimed an interest in such land by reason of the special warranty deed signed by the Overturfs August 22, 1980, which deed, as noted earlier, described land that lay within the tract described by the City's 1947 deed.

The City prayed the court to cancel the special warranty deed, and to decree that Gilliland had no right, title, or interest in the land described in the City's 1947 deed.

In her answer, Gilliland advanced a number of reasons why the City was "without interest in the disputed property." These included (1) adverse possession by Gilliland and her predecessors, (2) estoppel to deny that the fence line was the City's east boundary, (3) acquiescence by the City that the fence line was its east boundary, so that such line had become the east boundary by operation of law, and (4) mutual mistake in the description in the City's 1947 deed from the Smiths. Gilliland's answer, as we comprehend it, averred that she owned all of the land described in the City's 1947 deed, not just the nine acres, more or less, described in the special warranty deed to her from the Overturfs.

Gilliland, in addition to answering, filed a counterclaim against the City, and also filed a third-party petition against the Overturfs. The Overturfs counterclaimed against Gilliland. These pleadings were later superseded by amended versions.

Gilliland went to trial on her third amended counterclaim against the City. That pleading, with leave of court, was filed the morning trial began, and was in four counts.

Count I prayed the court to decree that the City had no right, title, or interest in the land described in its 1947 deed, and "for such equitable relief as is necessary to remove the cloud of [the City's] claim from [Gilliland's] property."

Count II concerned a tract not yet mentioned. That tract had been conveyed to Gilliland June 28, 1980, by warranty deed from Ralph P. Kimzey and Satoko Kimzey. According to the metes and bounds description in that deed, the tract consisted of a fraction of the northeast quarter of the southwest quarter of section 4, and a fraction of the northwest quarter of the southeast quarter of section 4. Obviously, the land conveyed by the Kimzey deed did not—as described—overlap any of the land heretofore mentioned. All of the land heretofore mentioned, as we have seen, lies in the north half of section 4. Count II pleaded that the City claimed an interest in the property described in the Kimzey deed, and that the City was occupying a portion thereof. Count II prayed the court to decree that the City had no right, title or interest in said tract, and to order the City to immediately relinquish possession thereof. As more fully appears *infra*, there was no probative evidence at trial regarding the location, *on the ground*, of the tract described in the Kimzey deed. The City, however, in its brief, states that the tract is purportedly "on or adjacent to the south runway of the airport." The disputed land referred to earlier, it will be recalled, is adjacent to the *north* runway.

Count III of Gilliland's third amended counterclaim pertained to the land adjacent to the north runway, as did Count I. Count III alleged that some time after the City filed suit, Gilliland and Mayor Sullivan had "agreed upon a settlement" regarding that land. Under the settlement, according to Count III, the City was to quitclaim to Gilliland slightly less than five acres, and Gilliland was to quitclaim to the City some 13.7 acres. Count III averred that the "City Council" thereafter approved the settlement, but that the City had refused to execute the necessary deed. Count III prayed for a decree of specific performance

ordering the City to consummate the settlement.

Count IV of Gilliland's third amended counterclaim reiterated the allegations about the settlement, adding that in reliance thereon, Gilliland had retained a surveyor to ascertain the correct descriptions of the tracts to be respectively quitclaimed, and had also retained a lawyer to draft the deeds and releases. Count IV sought judgment against the City for $5,000 damages.

All of the issues between all of the parties were tried by the court without a jury. Discussion of the issues between Gilliland and the Overturfs will be deferred until we have ruled on the issues between Gilliland and the City.

The trial court made extensive findings of fact and conclusions of law. In an effort to keep this opinion within conscionable length, and mindful that credibility of witnesses and the weight to be given their testimony was for the trial court, *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App. 1985); *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App.1983), which was free to believe none, part, or all of the testimony of any witness, *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 206[8] (Mo.App.1984); *Lohrmann v. Carter*, 657 S.W.2d 372, 377 (Mo.App.1983), we shall set out some of the pertinent findings of fact instead of summarizing the evidence on which the trial court based them. All of the findings we recite are supported by competent and substantial evidence, and none are against the weight of the evidence.

The trial court found:

1. The fence along the east side of the airport has maintained its present location and position since 1947.

2. No agent, employee, or servant of the City has exercised any type of maintenance or repair to the fence line since 1947, and likewise has not developed, maintained, or repaired any of the property east of the fence line or any item thereon.

3. Gilliland and her predecessors in title have permitted their cattle and other livestock to graze on the property east of the fence line since 1947, and defendant and her predecessors in title have expended funds since 1947 for fence repair and other maintenance of the disputed property.

4. Roy Overturf built a pond on the property east of the fence line during the time he owned the Overturf farm.[2]

5. Agents, servants, and employees of the City have mowed grass immediately west of the fence line since 1947. Between 1947 and the filing of this suit, agents, servants, employees, or persons acting on behalf of the City, in order to clear brush or mow grass immediately west of the fence line, have lifted the fence from time to time, but in each instance they have placed the fence back in the location where it had previously been.

6. Between 1947 and the filing of this suit, no agent, employee, servant, or person acting on behalf of the City ever informed Gilliland or her predecessors in title that the City sought ownership or control of the property east of the fence line.

By now, an alert reader will have noticed that we have not set forth the precise location of the fence east of the north runway. That is not due to oversight. No party produced probative evidence of the location at trial.

Larry Gardner, a qualified land surveyor called by the City, presented a sketch of the southeast quarter of the northwest quarter of section 4 and the northeast quarter of the southwest quarter of section 4, but there was no testimony by Gardner that, in preparing it, he had commenced at either an existent government corner or at a statutorily reestablished government corner. Moreover, the location of the fence, as shown on Gardner's sketch, was penciled in by him at trial with the explanation that it lay "[s]omewhere in that area" (the eastern portion of the southeast quarter of

the northwest quarter). No specific distances, reference points, or compass directions were supplied.

Benny T. Rozell, a qualified land surveyor called by Gilliland, testified he surveyed the southeast quarter of the northwest quarter of section 4, but he conceded that he did not base his survey on "a government corner of any kind." The reason, according to Rozell, was that at the time of his survey (December, 1984), the parties believed they had reached a settlement, and his task was "to come up with two descriptions so that they could settle with."

Rozell, like Gardner, provided no details by which the location of the fence could be described in a judgment.

The only thing arguably resembling a description of the location of the fence was the description in the special warranty deed of August 22, 1980, from the Overturfs to Gilliland. That instrument, it will be recalled, purported to describe a nine acre tract in the southeast quarter of the northwest quarter of section 4, then stated that the west boundary thereof was "the now existing fence along the East boundary of the airport property." There was, however, no evidence that an existent or statutorily reestablished government corner was utilized in formulating that description. Indeed, the source of the description is unrevealed.

There was likewise no probative evidence as to whether any portion of the airport lies on any land described in the June 28, 1980, warranty deed from the Kimzeys to Gilliland (the subject of Count II of Gilliland's third amended counterclaim). While surveyor Gardner's sketch, as we comprehend it, indicates that the south runway crosses a small portion of the southwest corner of that tract, there was, as emphasized earlier, no showing that Gardner, in preparing the sketch, began at an existent or statutorily reestablished government corner.

---

**2.** The Overturfs acquired the tract heretofore referred to as the Overturf farm by warranty deed from Robert Bryant and Mabel Bryant executed September 24, 1963. The City does not question the validity of the Overturfs' title to that tract during the time they owned it, nor does the City question the validity of Gilliland's title to that tract now.

In *Cantrell v. Bank of Poplar Bluff*, 702 S.W.2d 935, 938[1] (Mo.App.1985), we pointed out that *Carroz v. Kaminiski*, 467 S.W.2d 871, 872 (Mo. banc 1971), was the latest in a line of decisions by the Supreme Court of Missouri wherein it is stated that evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes, is of no probative force. We traced the development of the rule from its origin in the early years of this century, and identified some twenty cases in which the rule had been applied. We observed that the rule was so firmly embedded in the case law of Missouri that any departure from it, or any relaxation in its application, was for the Supreme Court of Missouri, not us, to determine. *Cantrell*, 702 S.W.2d at 941.

It is clear from *Cantrell* and the cases cited therein that there was no probative evidence before the trial court in the instant case establishing, by legal description, the location of the fence east of the north runway, and no probative evidence that any part of the airport lies on any land described in the deed from the Kimzeys to Gilliland.

The trial court nonetheless found that the fence east of the north runway lies on the west boundary of the tract described in the special warranty deed of August 22, 1980, from the Overturfs to Gilliland. Additionally, the trial court ruled, as a conclusion of law, that Gilliland's title to the tract described in the June 28, 1980, deed from the Kimzeys to Gilliland was superior to that of the City.

Having made those determinations, the trial court entered judgment in favor of Gilliland and against the City on the City's amended petition, and in favor of Gilliland and against the City on Counts I and II of Gilliland's third amended counterclaim. The judgment, as we read it, vests Gilliland with title to the land described in the special warranty deed of August 22, 1980, from the Overturfs, and also vests Gilliland with title to the land described in the June 28, 1980, deed from the Kimzeys.

As to Count III of Gilliland's third amended counterclaim, the trial court found that Gilliland and Mayor Sullivan had indeed agreed on a settlement of the dispute regarding the land east of the north runway, and that the terms of the settlement had been accepted by the "City Council" September 13, 1984. The trial court further found that Gilliland, in order to determine the boundaries of the tracts to be respectively quitclaimed, had incurred a survey bill from Rozell for $877.64, and had incurred an attorney fee of $600, said expenses being reasonable and necessary. The trial court also found, however, that the "City Council" ultimately reversed its decision to settle, and never enacted an ordinance accepting the settlement.

Because the City failed to approve the settlement by ordinance, the trial court concluded, as a matter of law, that no valid settlement agreement was reached. Consequently, the trial court denied Gilliland relief on Count III of her third amended counterclaim. For the same reason, the trial court also denied Gilliland relief on Count IV of her third amended counterclaim.

The City appeals—number 14382—from (a) that portion of the judgment denying relief on the City's amended petition, and (b) that portion of the judgment granting Gilliland relief on Counts I and II of her third amended counterclaim.

Gilliland appeals—number 14392—from that portion of the judgment denying relief on Counts III and IV of her third amended counterclaim. As appears more fully *infra*, Gilliland also appeals from that portion of the judgment pertaining to her third-party claim against the Overturfs and their counterclaim against her. As indicated earlier, discussion of those issues will follow our disposition of the issues between the City and Gilliland.

The City's first point attacks the trial court's denial of relief to the City on its amended petition, and also attacks the trial court's grant of relief to Gilliland on Count I of her third amended counterclaim. Thus, the City's first point pertains only to

the land lying east of the fence situated east of the *north* runway, and does not concern the land described in the June 28, 1980, deed from the Kimzeys to Gilliland, which was the subject of Count II of Gilliland's third amended counterclaim.

The City's first point contains six subparagraphs designated, respectively, "A" through "F." Subparagraph "A" maintains that the City's "evidence of deeds established record title to the property claimed in its [amended] petition, and [Gilliland] produced no substantial evidence to dispute [the City's] legal title to such property."

The City's evidence included certified copies of recorded conveyances showing the chain of title to the tract described in the City's 1947 deed from the Smiths. The chain began with a patent dated July 3, 1888, from the United States to the original homesteader, and continued forward, unbroken, through mesne conveyances, to the City.

The only documentary evidence supporting Gilliland's claim to any land described in the City's 1947 deed from the Smiths was the special warranty deed of August 22, 1980, from the Overturfs to Gilliland. The Overturfs appear nowhere in the chain of title to the land described in the City's 1947 deed, and Gilliland conceded at trial that she knew the Overturfs did not have "ownership by deed" to any of the land described in the special warranty deed.

Consequently, on the basis of record title alone, the City's claim of ownership to the land described in its 1947 deed is indubitably superior to that of Gilliland, and if Gilliland is to prevail, it must be on a basis other than record ownership.

The trial court, in its conclusions of law, set forth sundry theories in support of its holding that Gilliland owned the tract described in the special warranty deed from the Overturfs. One such theory was adverse possession, i.e., that Gilliland and her predecessors in title had occupied said tract

openly, notoriously, and adversely to the City more than ten years prior to the commencement of this suit.

Subparagraphs "B" and "C" of the City's first point challenge the trial court's reliance on adverse possession. Subparagraph "B" states:

"The trial court erroneously declared and applied the law, because [Gilliland's] claim of adverse possession is insufficient as a matter of law, in that adverse possession cannot be maintained against a city under Section 516.090 RSMo. [1978]." [3]

Subparagraph "C" of the City's first point states:

"Even if adverse possession were permissible against the City, there is no substantial evidence to support the trial court's judgment based upon adverse possession, and that judgment is against the weight of the evidence, because there is no substantial evidence in the record adequately describing the property claimed by defendant upon which the trial court could have based its judgment."

We shall consider subparagraph "C" before dealing with subparagraph "B."

■ The City reminds us that a party claiming title to real estate by adverse possession must establish, among other things, the precise location and boundaries of the property claimed. *Hughes v. Israel*, 73 Mo. 538, 548[4] (1881); *Ortmeyer v. Bruemmer*, 680 S.W.2d 384, 393[19] (Mo.App. 1984); *Carender v. Barry*, 623 S.W.2d 73, 75[3] (Mo.App.1981). Absent such proof, any judgment would be void because it would rest entirely on speculation and conjecture. *Teson v. Vasquez*, 561 S.W.2d 119, 127[27] (Mo.App.1977).

The trial court, as noted earlier, found that Gilliland and her predecessors in title had occupied the land east of the fence situated east of the north runway for more than ten years prior to the commencement

---

**3.** Section 516.090, RSMo 1978, states: "Nothing contained in any statute of limitation shall extend to any lands given, granted, sequestered or appropriated to any public, pious or charitable use, or to any lands belonging to this state."

of this action. The City, in its brief, does not challenge that finding. However, as we have seen, there was no probative evidence of the precise location, by metes and bounds or any other method of description, of the land so occupied. That being so, the trial court's holding that Gilliland had acquired ownership, by adverse possession, *of the tract described in the special warranty deed of August 22, 1980, from the Overturfs,* is not supported by competent and substantial evidence.

If adverse possession had been the sole ground relied on by Gilliland in support of her claim to the land east of the fence situated east of the north runway, and if the only infirmity in that portion of the judgment pertaining to such land had been the lack of proof of the legal description thereof, our task would merely be to follow *Longbottom v. Rains,* 632 S.W.2d 525 (Mo. App.1982). There, occupants of certain real estate south and west of a fence were held to have acquired ownership thereof by adverse possession. The judgment contained no distances, directions, or dimensions by which the tract could be located on the ground. The finding that the occupants had acquired ownership by adverse possession was upheld, but the judgment was reversed and remanded for further evidence as to the description of the tract, including a survey.

The instant case, however, is not so simple.

The City, in subparagraph "B" of its first point (quoted above), maintains that by reason of § 516.090, RSMo 1978, Gilliland could not acquire ownership of any of the City's land by adverse possession. If that be true, and if, on the record before us, ownership by Gilliland of the land in the southeast quarter of the northwest quarter of section 4 east of the fence cannot be upheld on any other theory, remand for a survey to ascertain the correct description of that land would obviously serve no purpose. We must, therefore, decide whether § 516.090, RSMo 1978, precluded Gilliland from acquiring ownership of such land by adverse possession.

Gilliland concedes that as a general rule, a municipality's rights in real estate cannot be extinguished by adverse possession. *City of St. Louis v. Missouri Pac. Ry. Co.,* 114 Mo. 13, 21 S.W. 202, 206 (1893), private right to public street cannot be acquired by adverse possession even though street has not been graded, paved, or otherwise improved by the municipality; *Brown v. City of Carthage,* 128 Mo. 10, 30 S.W. 312, 313 (1895), 17 years' encroachment on portion of area dedicated as street confers no right on squatter as against municipality's right to use strip for purpose dedicated; *City of Pacific v. Ryan,* 325 Mo. 373, 28 S.W.2d 652 (1930), over 40 years' possession of portion of strip platted and dedicated as public alley ineffective to divest municipality of title. See also: *City of South Greenfield v. Cagle,* 591 S.W.2d 156, 159[2] (Mo. App.1979); *City of Poplar Bluff v. Knox,* 410 S.W.2d 100, 102–03[6] (Mo.App.1966).

Gilliland insists, however, that even if the City has record title to any land east of the fence situated east of the north runway, the City never owned such land in its "governmental capacity," but merely in its "proprietary capacity." That, says Gilliland, is because the City never subjected such land to a public use. Gilliland emphasizes that she and her predecessors have used the land as they pleased, and that the City has never claimed such land or used any of it for any purpose whatsoever. The trial court so found, and the evidence fully supports such finding.

Gilliland maintains that if (as she theorizes) the City owned land east of the fence in its proprietary capacity only, the City's title could be lost through adverse possession. In support of that premise, Gilliland relies on one Missouri case, *Crigler v. City of Mexico,* 101 Mo.App. 624, 74 S.W. 384 (1903), and cases from other jurisdictions.

*Crigler,* as we read it, does not aid Gilliland. There, an addition to a municipality was platted in 1855, showing streets and alleys. In 1893, the municipality undertook to open a segment of a platted alley never before utilized. On that segment, a prior owner of abutting land had built costly

improvements which, along with valuable shade trees, would have to be removed. The extant landowner sued to enjoin the municipality, and his evidence demonstrated that his predecessors in title had adversely occupied the land in issue since before the Civil War. The legislative act that is now § 516.090, RSMo 1978,[4] had been enacted in 1865, and had taken effect August 1, 1866. *City of Pacific,* 28 S.W.2d at 654[3]. Where adverse possession of lands mentioned in the statute commenced before August 1, 1866, the statute of limitations ran against such lands. *Hunter v. Pinnell,* 193 Mo. 142, 91 S.W. 472 (1906). That was the reason for the 1866 change. As explained by Judge Lamm in *Dudley v. Clark,* 255 Mo. 570, 164 S.W. 608, 612 (1914):

> "Prior to that statute this state had, through its statutes, adopted the public policy of allowing the limitations to run against the state and municipalities. It was found to be a ruinous public policy, for under it school lands, roads, parks, streets, etc., were lost to the state and public through the laches or ignorance of the public or of officials representing it. Is it not learned at the fireside that what is everybody's business is nobody's business? To put a stop to that mischief was one of the main objects of that statute."

In *Crigler,* as adverse possession had commenced prior to the Civil War—and thus prior to the enactment of the forerunner of § 516.090, RSMo 1978—the municipality was divested of its interest in the alley.

*Crigler,* as we analyze it, does not support Gilliland's hypothesis that in Missouri, statutes of limitation run against land held by a municipality in its proprietary capacity. Whether such a rule exists in certain other jurisdictions is of no moment, as we must decide these appeals under Missouri law.

Gilliland also argues, with commendable ingenuity, that § 516.090, RSMo 1978, by its own terms, bars the running of statutes of limitation only against (a) lands devoted to a public, pious or charitable *use,* or (b) lands owned by the State. The land in dispute here is not, of course, owned by the State, and Gilliland contends that such land is not devoted to any public use, as it has not been used for the airport or for any other public purpose. Thus, says Gilliland, § 516.090, RSMo 1978, did not prevent the City's ownership from being divested by adverse possession.

In support of this theory, Gilliland refers us to the following excerpt from *Dunklin County v. Chouteau,* 120 Mo. 577, 25 S.W. 553, 557 (1894):

> "Distinction must also be made between property held for strictly public purposes, as for streets, parks, commons, and the like, and property held by the corporation in its private character. Dill. Mun.Corp. § 675. This distinction is made in our present statute of limitations. Rev.St.1889, § 6772." [5]

While that quote, standing alone, ostensibly supports Gilliland's position, it must be considered in the context of the dispute in *Dunklin County.*

Missouri, by act of Congress in 1850, had acquired certain swamp lands. Missouri subsequently donated those lands to the counties where the lands were situated, giving the county courts power to reclaim the lands and sell them. Dunklin County conveyed some 100,000 acres of swamp land to a railroad company in exchange for shares of the company's stock. The company thereafter conveyed the land to trustees to secure bonds issued by the company to raise money to build the track. The company ultimately defaulted on the bonds, and the land was sold at foreclosure. Thereafter, further events took place which are exhaustively detailed in the opinion in *Dunklin County,* and which we need not summarize here. Some 33 years after the lands had been conveyed to the railroad company, the county brought suit to set that conveyance aside. In denying relief, the opinion stated that the doctrine of lach-

---

4. Footnote 3, *supra.*

5. Section 6772, Rev.St.1889, and § 516.090, RSMo 1978 (footnote 3, *supra*) are identical.

es applied to a county or other municipal corporation, as well as to individuals. The opinion held that the delay and conduct of the county was a bar to the relief it sought, and this was true though the owner of the land may not have had ten years' adverse possession. 25 S.W. at 557.

It is evident that the denial of relief in *Dunklin County* was not based on a finding that the landowner had acquired title by adverse possession. Furthermore, in that case the county was endeavoring to set aside its own conveyance. The paramount issue was not whether one could acquire title to county-owned land by adverse possession, but instead whether the county was barred by its own neglect from attacking its conveyance. *Dunklin County*, according to our interpretation, does not support the proposition for which Gilliland cites it.

■ We are persuaded by the cases we have mentioned that there is nothing in the circumstances of the instant case or in the Missouri decisions cited by Gilliland that would enable her to acquire title, by adverse possession, to any land owned by the City east of the fence situated east of the north runway. Accordingly, we hold that the trial court erred in ruling that Gilliland had acquired title by adverse possession to the land described in the special warranty deed of August 22, 1980, from the Overturfs.

Adverse possession was not, however, the only theory relied on by the trial court in ruling in favor of Gilliland on the City's amended petition and on Count I of Gilliland's third amended counterclaim. The trial court's conclusions of law contained, *inter alia*, the following:

"2. That [the City] has acquiesced and agreed that the existing fence line along the east boundary of the airport is the boundary between [the City's] property and [Gilliland's] property and that,

therefore, [the City] is estopped from denying the same.

3. That [Gilliland] and her predecessors in title relied upon the fence line as the boundary line and that [the City] is estopped from denying the accuracy of the same." [6]

Subparagraph "D" of the City's first point attacks the above conclusions. Subparagraph "D" states:

"The trial court erroneously applied the law in concluding that estoppel was applicable to the City, and there is no substantial evidence to support the trial court's judgment based upon estoppel, because the evidence established that [Gilliland] knew there was a dispute as to the property boundaries along the north runway before accepting a deed to the property, and therefore the essential elements of lack of knowledge and reliance necessary to create an estoppel are lacking under the evidence."

Pertinent to the above contention, the trial court's findings of fact contain the following:

"5. That when the [Overturf] farm was shown to [Blisard] ... Roy Overturf informed [Blisard] that there was a question as to the boundary line on the west side of the farm and both the listing agreement and the contract for the sale of the real estate made reference to the disputed boundary on the west side and both instruments made further reference to acquiring the disputed property by adverse possession.

6. That [the Overturfs] did not represent to [Blisard] or [Gilliland] that the legal boundary line on the west side of their property was the fence line, but rather they told [Blisard] and [Gilliland] that they did not know where the true boundary line was on the west side of their property."

---

6. In a conclusion of law numbered "7," which we have not overlooked, the trial court stated that Gilliland had relied upon the conveyances in her chain of title to the Overturf farm which purported to show the boundary between the property of the City and that of Gilliland is the fence line. We have studied those conveyances, but espy no reference to the fence line in any of them. We therefore find in conclusion of law "7" no support for the trial court's theory that the City is equitably estopped from claiming ownership of property east of the fence.

It is evident from the testimony alluded to earlier that there was competent and substantial evidence to support the above findings. Gilliland does not argue otherwise.

■ We need not, in considering subparagraph "D" of the City's first point, embark on an extended discussion of estoppel. For that, see *Van Kampen v. Kauffman*, 685 S.W.2d 619, 625[1–4] (Mo.App.1985). In the circumstances of the instant case, all that is necessary is to point out that one cannot set up another's act or conduct as the ground of an estoppel unless the one claiming it be misled or deceived by such act or conduct, nor can he set it up where he knew or had the same means of knowledge as the other as to the truth. *Land Clearance for Redevelopment Authority of Kansas City v. Dunn*, 416 S.W.2d 948, 951[1] (Mo.1967); *Van Kampen*, 685 S.W.2d at 625[5]; *Lytle v. Page*, 591 S.W.2d 421, 424[3] (Mo.App.1979).

There is, in the record before us, no evidence that any representative of the City ever told Gilliland or her predecessors in title that the fence east of the north runway was the east boundary of the City's land. Thus, estoppel could lie against the City, if at all, only because of the City's failure to assert ownership of any land east of the fence. Whether that would be enough to estop the City is not, however, a question we need decide. That is because the trial court's findings of fact numbered 5 and 6, quoted above, conclusively· established that Gilliland was not misled or deceived, by the City or anyone else, into believing that the fence was the City's east boundary. It is clear from the cases cited above that one who is not misled or deceived by another's act or conduct cannot base an estoppel on such act or conduct. Gilliland, in her brief, makes no attempt to justify, on the basis of estoppel, the portion of the judgment pertaining to the City's amended petition and Count I of her third amended counterclaim.

We agree with subparagraph "D" of the City's first point, and hold that the trial court erred in ruling that the City is estopped from denying that the fence east of the north runway is the east boundary of the City's land. Having so decided, we do not reach the question of when, if ever, estoppel might apply against a governmental entity.

Two other theories relied on by the trial court in ruling for Gilliland on the City's amended petition and on Count I of Gilliland's third amended counterclaim appear in the following conclusions of law:

"4. That [the City] has not used, occupied, or claimed either possession or ownership of the property east of the fence line and, therefore, has waived any rights it may have with respect to the property.

5. That [the City] has acquiesced that the existing fence line lying along the east boundary of the airport property is the boundary between the [City's] property and [Gilliland's] property and, therefore, the acquiesced boundary (the fence line) has become the legal boundary between the respective properties."

Subparagraph "E" of the City's first point attacks the above conclusions. Subparagraph "E" states:

"There is no substantial evidence to support the trial court's judgment based upon waiver or acquiescence, and the trial court erroneously applied the law, because there was no evidence of any intent or action by the City to abandon the disputed property, and abandonment will not be presumed under the law."

■ *Cole County v. Board of Trustees of Jefferson City Free Library District*, 545 S.W.2d 422 (Mo.App.1976), addressed the issue whether property owned by a governmental subdivision (a library district) had been abandoned. In holding it had not, the court said: "It is well established that in order to show abandonment, an intention to abandon must be proved. Intention is the first and paramount object of inquiry, for there could be no abandonment without the intention to abandon. [Citing authority.] Such an intention may

be inferred only from strong and convincing evidence." *Id.* at 425[2].

*Wolf v. Miravalle,* 372 S.W.2d 28, 34[6] (Mo.1963), states: "The failure or neglect of municipal officers to assert the public right during the period of the statute of limitations will not constitute an abandonment or transfer to a private claimant of any part of city property held in trust for public use."

Gilliland does not direct our attention to any evidence exhibiting an intent by the City to abandon any part of the property deeded to it in 1947 by the Smiths, nor does Gilliland cite any authority supporting the trial court's theory that the City, through abandonment, lost ownership of any land it owned east of the fence situated east of the north runway.

■ As to whether the fence, by acquiescence, became "the legal boundary between the respective properties," the law is well stated in *Tillman v. Hutcherson,* 348 Mo. 473, 154 S.W.2d 104 (1941), and *Aley v. Hacienda Farms, Inc.,* 584 S.W.2d 126 (Mo.App.1979). In *Tillman,* 154 S.W.2d at 108[8], we learn that to establish a fence, or other marking, as an agreed boundary line by long acquiescence, there must be some acts or conduct recognizing it as such. In *Aley,* 584 S.W.2d at 128[3], it is explained: "When owners of adjoining land occupy their respective properties up to a certain line which they mutually recognize and acquiesce in for a long period of time, they may be precluded from claiming that the acquiesced in line is not the true boundary. ... However, ... the mere acquiescence in the existence of a fence as a barrier, for convenience or for any reason other than a boundary will not amount to an agreement as to a boundary or establish it as a true line."

It is indisputable that during the years the Overturfs owned the Overturf farm, they did not recognize the fence east of the north runway as the west boundary of their land. Their testimony as to what they told Blisard and Gilliland on that subject has already been noted, and the trial court, as we have seen, believed the Overturfs.

Additionally, Herman Pierce, former sheriff of Ozark County, testified that he once asked Roy Overturf if he (Pierce) could purchase an acre of land from Overturf. Pierce wanted to erect an aircraft hangar just east of the fence situated east of the north runway. Pierce quoted Overturf as saying: "I can't sell you that because it doesn't belong to me, it belongs to the city."

There was, without question, no mutual recognition by the City and the Overturfs that the fence east of the north runway was the lawful boundary between their respective properties. The City commenced this action within two years after the Blisards, the Wallaces, and Gilliland purchased the Overturf farm, so there was no long period of acquiescence after Gilliland first acquired an interest in that property.

Consequently, the portion of the judgment in favor of Gilliland on the City's amended petition and on Count I of her third amended counterclaim cannot be sustained on the theory that the City waived or abandoned any rights in the land it owned east of the fence situated east of the north runway, nor can it be sustained on the theory that the fence became the legal boundary between the City's land and the Overturf farm by acquiescence or agreement.

■ The final theory relied on by the trial court in ruling in favor of Gilliland on the City's amended petition and on Count I of Gilliland's third amended counterclaim was that the 1947 deed to the City from the Smiths contained a "mutual mistake," in that said deed, according to its terms, conveyed all of the land in the southeast quarter of the northwest quarter of section 4 east of Route E, whereas the parties to said deed did not intend that it convey any land east of the fence situated east of where the north runway now lies.

Subparagraph "F" of the City's first point, which we need not quote, argues

that there was no substantial evidence to support the above premise.

We agree.

Neither Walter Smith nor Bealie Smith testified, and there was not a scintilla of evidence that the deed they executed to the City in 1947 said anything other than what they and the City intended it to say. As noted earlier, the City's record title to the land described in the 1947 deed from the Smiths is intact, going back to the 1888 patent to the original homesteader. It would be the rankest sort of conjecture to speculate that the Smiths, in 1947, intended to convey to the City any land except the tract described in that conveyance. The trial court's "mutual mistake" theory is, in our opinion, devoid of evidentiary support. It is, therefore, untenable.

We have now considered all of the theories on which the trial court relied in ruling in favor of Gilliland on the City's amended petition and on Count I of Gilliland's third amended counterclaim, and have found no merit in any of them. Gilliland does not suggest, and we cannot conceive, any other justification for upholding that portion of the judgment. We therefore hold that the trial court erred in denying the City relief on its amended petition, and in granting Gilliland relief on Count I of her third amended counterclaim.

This brings us to the City's second, and final, point. It attacks that portion of the judgment pertaining to Count II of Gilliland's third amended counterclaim. That count, it will be recalled, averred that the City claims, and is occupying, a portion of the tract conveyed to Gilliland by the June 28, 1980, warranty deed from the Kimzeys. As noted earlier, the trial court permitted Gilliland to file her third amended counterclaim the morning trial began. The understanding between the trial court and counsel, as reflected in the transcript, was that the City would be permitted "to show a general denial and ... to assert affirmative defenses until such time as the Court chooses to close evidence on the matter." The record before us contains no written answer by the City to Gilliland's third amended counterclaim.

There was, as heretofore explained, no probative evidence of the location, on the ground, of the tract described in the Kimzey deed, nor was there any probative evidence that any portion of the airport encroaches on any land described in that conveyance. Surveyor Gardner's sketch, as we interpret it, indicates that the south runway crosses a small portion of the southwest corner of the tract described in the Kimzey deed, but, as we have seen, there was no showing that Gardner, in preparing the sketch, began at an existent or statutorily reestablished government corner.

The trial court made no finding on whether the City was encroaching on any land described in the Kimzey deed. The trial court simply ruled: "That the title of [Gilliland] to the Kimzey Property is superior to that of [the City]."

The City's second point contains two subparagraphs designated, respectively, "A" and "B." Subparagraph "A" states:

"There was no substantial evidence that the property claimed by [Gilliland] pursuant to her deed from the Kimzeys was the same property claimed or occupied by [the City] and the trial court's judgment so finding is against the weight of the evidence."

The contention misstates the record. We are unable to locate any finding by the trial court that any of the land described in the Kimzey deed was "occupied" or "claimed" by the City. It must be remembered that the land conveyed by the Kimzey deed, as described, does not overlap any of the land described in the 1947 deed from the Smiths to the City. All of the land in the Kimzey deed lies in the south half of section 4, while all of the land in the City's 1947 deed lies in the southeast quarter of the northwest quarter of section 4. Thus, the City does not, on the basis of its 1947 deed from the Smiths, have a claim, by deed, to any land described in the Kimzey deed.

There is, however, another deed that must now, for the first time, be mentioned.

That is a 1946 deed from five grantors to the City, conveying a strip in the east half of the southwest quarter of section 4. For convenience, this instrument is henceforth referred to as "the Bushong deed" (three of the five grantors bore that surname).

The tract described in the Bushong deed begins at a point on the north line of the southwest quarter, 345 feet east of the northwest corner of the northeast quarter of the southwest quarter. From there, the boundary runs southeasterly 2,000 feet, thence due east 200 feet, thence northwesterly 2,000 feet to the north line of the southwest quarter, thence west 200 feet to the place of beginning.

The tract described in the Bushong deed, as we understand the parties, is where the airport's south runway lies. Without a survey commenced at an existent or statutorily reestablished government corner, it cannot be determined whether any portion of that tract, as described, overlaps any portion of the tract described in the Kimzey deed.

■ Summed up, we have, so far as Count II of Gilliland's third amended counterclaim is concerned: (1) title by deed in Gilliland to the tract described in the Kimzey deed, (2) title by deed in the City to the tract described in the Bushong deed, (3) no probative evidence that there is any overlap of the two tracts, as described, and (4) no probative evidence of actual encroachment by the airport on the tract described in the Kimzey deed.

In these circumstances, who prevails? Ironically, the City and Gilliland rely on the same case, *Lock v. Bennartz*, 470 S.W.2d 801 (Mo.1971).

The pleadings and evidence in *Lock* were remarkably similar to the pleadings and evidence as to Count II of Gilliland's third amended counterclaim. In *Lock*, the plaintiffs alleged they owned certain land, described in their petition by metes and bounds, and that the defendants claimed some interest in said land, the nature and character of which was unknown to the plaintiffs. The plaintiffs prayed the court to adjudicate them the fee simple owners, and to declare that the defendants had no right, title or interest in the land. The defendants' answer was a general denial. At trial, the plaintiffs produced a deed from their alleged predecessors in title. The defendants likewise produced a deed from their alleged predecessors in title. The descriptions in each of the deeds were by metes and bounds. There was no survey of the disputed area, and there was no competent evidence showing the precise location of the disputed land or the precise location of the land described in either deed. The trial court decreed that fee simple title to the land described in the deed on which the plaintiffs relied was in the plaintiffs. On appellate review, it could not be determined whether that result was reached because the trial court concluded that the disputed land was not included in the description in the defendants' deed, or because one of the defendants' predecessors in title did not own the land described in the defendants' deed, or for some other reason. The opinion pointed out that the plaintiffs had the burden to establish their title to the land in controversy by competent evidence, that their claim was based on a deed describing certain land, and that there was no competent evidence that the description in that deed included any or all of the real estate admitted by the parties to be the subject of the controversy. *Id.* at 802. The judgment was reversed and the cause was remanded.

We hold that the same disposition is called for here in regard to that portion of the judgment pertaining to Count II of Gilliland's third amended counterclaim. It may be that a survey commenced at an existent or statutorily reestablished government corner will reveal that the land described in the Bushong deed does not overlap the land described in the Kimzey deed, and that the airport does not encroach on the land described in the Kimzey deed. If those circumstances are found to exist, there is no controversy to be adjudicated under Count II of Gilliland's third amended counterclaim. If, however, a proper survey reveals that the land de-

scribed in the Bushong deed overlaps the land described in the Kimzey deed, the trial court will have to determine whether the City or Gilliland has the better title to the segment where the overlap exists. If there is no overlap by the tracts, as described, but if a proper survey reveals that the airport is encroaching on land described in the Kimzey deed, the trial court will have to determine whether the City has acquired title to that segment by adverse possession.

Subparagraph "B" of the City's second point asserts that if there is in fact an overlap of the tracts described, respectively, in the Bushong deed and the Kimzey deed, the City's title to the area where the overlap exists is superior to Gilliland's because the Bushong deed was executed in 1946, whereas the Kimzey deed was executed in 1980. The contention is meritless. The City claims through the Bushongs. Gilliland claims through the Kimzeys. An examination of the respective chains of title of the City and Gilliland may reveal that Gilliland has the superior claim.

Having determined that the portion of the judgment pertaining to Count II of Gilliland's third amended counterclaim must be reversed and that the cause must be remanded for a new trial on that count, we have completed our consideration of the issues on the City's appeal. We therefore turn to Gilliland's appeal, addressing first the issues between Gilliland and the City.

In her brief, Gilliland has cautioned us that she does not desire reversal of that portion of the judgment denying relief on Counts III and IV of her third amended counterclaim if we uphold that portion of the judgment denying the City relief on its amended petition and granting Gilliland relief on Counts I and II of her third amended counterclaim. In view of our decisions regarding those aspects of the case, it is necessary for us to address Gilliland's appeal from the denial of relief on Counts III and IV of her third amended counterclaim.

The trial court, in ruling that no valid settlement agreement was entered into by the City and Gilliland, stated that the City is "a City of Fourth Class and can speak on such matters only by ordinance and no ordinance was presented or voted upon as provided by law in such cases."

Gilliland's first point states:

"The trial court erroneously declared ... that [the City] was a city of the fourth class, and thus did not settle its claims ... with Gilliland because it did not do so by ordinance, because [the City] waived its status as a city of the fourth class in defending the claim by Gilliland for specific performance of the settlement in that [the City] never filed an answer to the third amended counterclaim of Gilliland to set forth the defense, did not even object to testimony at trial concerning the settlement pursuant to that defense, and moreover, did not present evidence or request judicial notice that [the City] was a city of the fourth class."

■ The first element of this point, as we understand it, is that inasmuch as the City filed no answer to Gilliland's third amended counterclaim, the City was precluded from contending that its failure to enact an ordinance approving the proposed settlement rendered the agreement unenforceable. Gilliland's contention is without merit.

We noted earlier that when the trial court allowed Gilliland to file her third amended counterclaim on the morning trial began, it was with the understanding that the City would be allowed to make a general denial and to assert affirmative defenses until the trial court closed the evidence. Indeed, that suggestion came from Gilliland's counsel. Moreover, during the testimony of City Clerk Velma Hambelton, the following colloquy occurred during questioning by the City's counsel:

"Q. Velma, was any ordinance of resolution drafted and signed by the Mayor with respect to the action that was taken on any of these meetings [at which settlement of the lawsuit was discussed]?

A. There has not been an ordinance or a resolution drawn on this.

Q. So the matter hangs just as you have read from the minutes?

A. Yes, sir."

Obviously, the purpose of this inquiry was to establish that no ordinance approving the proposed settlement was ever enacted by the City's board of aldermen. Gilliland voiced no objection to this testimony.

Under Rule 55.33(b), Missouri Rules of Civil Procedure (16th ed. 1985), when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Gilliland's failure to object to the above testimony constituted implied consent for determination of the issues raised by such testimony. *Arnett v. Venters,* 673 S.W.2d 67, 72[1] (Mo.App.1984); *East v. Landmark Central Bank & Trust Co.,* 585 S.W.2d 222, 226[9] (Mo.App.1979).

The City made its position clear before any evidence was presented. In opposing the filing of Gilliland's third amended counterclaim on the morning trial began, the City's counsel said: " ... the City Council, which of course as the Court knows must act and speak through ordinance, did not ever by ordinance approve any such settlement even though it was discussed at the regular council meetings. ... the statutes are very clear, and certainly they are statutes that are based upon good judgment requiring that City Council must speak through ordinance. And there has been no ordinance, there is no ordinance on behalf of the City ... which agrees to this settlement." Gilliland did not protest to the trial court that this contention was beyond the scope of the pleadings.

The issue of the enforceability of the settlement agreement absent an ordinance approving it was, without question, tried by consent.

■ The second component of Gilliland's first point is that the City failed to establish that it was a city of the fourth class, in that it presented no evidence on that subject and neglected to request the trial court to take judicial notice thereof.

All cities in this State containing 500 and fewer than 3,000 inhabitants are cities of the fourth class. § 72.040.1, RSMo Cum. Supp.1984.

The courts of Missouri take judicial notice, without proof, of the population of all cities in Missouri, according to the last official enumeration of the inhabitants thereof, state, federal, or municipal. § 490.700, RSMo 1978; *State ex rel. State Highway Commission v. Galeener,* 402 S.W.2d 336, 338–39 (Mo.1966); *Moulder v. Webb,* 527 S.W.2d 417, 419[4] (Mo.App. 1975). We judicially know, as did the trial court, that the City's population, according to the 1980 United States census statistics, was 707. Official Manual, State of Missouri, 1983–1984, p. 1214. The City is, *a fortiori,* a city of the fourth class.

There is no merit in any aspect of Gilliland's first point. Gilliland's second point states:

" ... the trial court erroneously applied the facts to the law ... because there was sufficient and substantial evidence to find that [the City], a city of the fourth class, by its city council fulfilled the mandatory requirements of § 79.130, RSMo 1978, and reached a settlement with Gilliland in that the city council met on September 13, 1984, for, among other reasons, the purpose of considering the settlement offer of Gilliland. The city council, which through the city clerk, entered the ayes and nays in its journal of minutes. Moreover, the four councilmen present at this meeting unanimously voted to accept the proposal. Moreover, the failure to read the bill three times does not render the bill (or settlement agreement) void or invalid because it is not mandatory. The conduct of Mayor Sullivan in notifying Gilliland of the settlement and his neglect to send the bill back to council cured any deficiency pursuant to § 79.140, RSMo 1978, when Mayor Sullivan failed to sign the minutes."

The evidentiary basis for Gilliland's second point is an excerpt from the "minute book" of the meetings of the City's board of aldermen. The excerpt pertains to a

meeting September 13, 1984, while this suit was awaiting trial. The excerpt states:

"Airport property: The lawsuit between Brenda Gilliland and the City of Gainesville over the property line at the airport. Mayor Sullivan advised he had gone to the airport with Ms. Brenda Gilliland, and had looked at the land and a possible fence line she was offering to the City for settlement of the lawsuit. He advised Ms. Gilliland has offered to pay all expenses that has [sic] been incurred and, also, for a new survey and will also move the fence.

Mr. Sullivan and Mr. Peters both stated the land she has offered us in [sic] on top of the hill and would benefit the City more than the original plat of land.

Mayor Sullivan asked that all the council should go with him to the airport, but no one wanted to go. Alderman Buddy Fast made a motion to accept Ms. Gilliland's offer for settlement, second by Alva Hollingsworth, motion carried."

The roll call, shown in the minutes, was four votes yea, with two aldermen absent. According to City Clerk Hambelton, there were "six City Council members" at the time of the meeting.

The next mention of the suit in the minute book is in the minutes of a January 17, 1985, meeting. Those minutes state:

"Ms. Brenda Gilliland showed a drawing of the land at the airport which is in the dispute between her and the City. She stated she would guarantee the City to have 13.7 acres as the deed called for. After a long discussion, the matter was tabled until the following Thursday evening at 5:30 p.m."

The final mention of the suit in the minute book is in the minutes of a January 24, 1985, meeting. Those minutes state:

"The airport: The council after looking at air photos and had gone out to the airport to see the land stated, Alderman Hollingsworth made the motion to let the Court settle the dispute, second by Wilbur Cowart, motion carried, five yeas."

The negotiations that preceded the September 13, 1984, action by the aldermen were conducted by Gilliland and Mayor Sullivan. Gilliland testified that she and he "went out to the farm together and looked over the property, walked over it." Then, said Gilliland:

"I agreed to guarantee the City that they would have 13.7 acres on that side of the highway, in that 40–acre tract, or in that, you know, out—for the northern runway, let's put it that way. And pay expenses and that I would move the— Have a survey made based on Mr. Gardner's prior representations—something I've left out—and move the fence.

Q. Okay. The property that you were going to allow the City to have was located where in relation to your property?

.     .     .     .     .

A. Basically, it was to be a triangular shaped piece of property with the corner, the southernmost point of it, to be along this southernmost fence line here along the corner, to go in a triangular shape along here. And there's sort of a winged thing for—of a fence of a cross-fence type thing, it was to go along that to wherever it needed to be to make sure they had 13.7 acres.

.     .     .     .     .

Q. Okay. What did the Mayor tell you he would do? With regard to—

A. He would check with the City Council and let me know.

Q. Did you hear again from the Mayor with regard to the settlement?

A. Yes, sir.

.     .     .     .     .

Q. And what did he tell you?

A. Told me go ahead and it was okay. Go ahead and do it. They'd agreed to ·settle.

.     .     .     .     .

Q. What did you do when the Mayor told you that the City Council had agreed to the settlement?

A. I contacted you all and explained the situation, and also either contacted or

had Rosell [sic] Engineering contacted to come over and do the survey work.

Q. And did he do the survey work?

A. Yes, sir.

Q. And did the survey reflect the understanding between yourself and the Mayor?

A. Yes, sir."

Mayor Sullivan confirmed that he and Gilliland made a trip to the property. His testimony included this:

"Q. And at that trip to the property, did you and Brenda discuss the potential settlement of this lawsuit?

A. Yes. Yeah, we did discuss it.

Q. And did she point out to you some property she'd be willing to give you?

A. Yes. We looked and talked about it. Yes, we did.

Q. And did she say, 'I'll guarantee you there will be 13.7 acres there'?

A. She said she would see that there was 13.7. Yes, sir.

Q. And what did you do after this meeting?

A. I took it to the council.

. . . . .

Q. And after [the aldermen's meeting of September 13, 1984], you told her they accepted it; is that correct?

A. I possibly did. Yes.

Q. And you knew that under that agreement she was going to go out and have a survey made to get—

A. Uh-huh.

Q. —specifically with regard to where exactly the lines would be.

A. Yes, sir.

Q. And she was even going to later undergo expense to move the fence; is that correct?

A. Yes, sir. Right.

Q. And you knew when you told her that the settlement was accepted, that she would go out and get a surveyor and begin that work; is that correct?

A. Right. Yes, sir.

Q. And when you told her it was settled, you expected her to do that?

A. Yes.

Q. That was the agreement, wasn't it?

A. Right.

Q. For her to go out and pay that. Sometime later Brenda produced you the survey?

A. Yes, sir.

Q. Is that correct?

A. Uh-huh.

Q. And it described what she had described to you out there that day, didn't it?

A. Yes, sir.

Q. And it provided you with 13.7 acres, didn't it?

A. Yes, sir.

Q. There wasn't anything different from what that survey that was presented to you, and what you had agreed that day on that hill to present to council.

A. Right.

Q. That's just what you had described to council at the meeting before, wasn't it?

A. Yes, sir."

Later in the Mayor's testimony, we find this:

"Q. When you and Brenda met that day out there, you actually walked over the property; is that right?

A. Yes, we did.

Q. And you had an understanding of where that line was to be; is that correct?

A. Close. Yes.

Q. And when you got the survey, it was right where you had envisioned it; is that correct?

A. No, it wasn't.

Q. It wasn't?

A. No, it wasn't.

Q. That's what you told me earlier. What was different about it?

A. It was west. It was a little bit west of where I thought it would approximately run.

Q. Let me see here now. Which way is—

A. More toward the airport.

Q. More to the airport?

A. Uh-huh.

Q. So actually your fence line was closer to the airport than what you thought it would have been?

A. Well, no, I knew, of course, where the old existing fence line is.

Q. Not the fence line, excuse me. Your property line under the agreement was going to be closer to the airport than what you even thought?

A. No. It should have went farther east than what—than what it did.

Q. Right.

A. Stood away.

Q. Than what you thought?

A. Yes.

Q. So the survey was going to give you more property than what you thought?

A. No, sir.

Q. It was going to give you 13.7 acres, right?

A. Yes. There was a 13.7. I didn't know how that was going to be figured.

Q. It's exactly where you and Brenda had agreed on it, though, wasn't it?

A. No, sir.

Q. Isn't that what you told me earlier?

A. Well, if I did, I made a mistake because it wasn't where I thought it was going to go.

Q. You told me twice. Are you changing your mind?

A. I'm sorry. But I thought it would be more east of there than what it was.

. . . . .

Q. Was there a meeting of the minds between you and Brenda as to where that line was going to be, ultimately?

A. Yes, we discussed it.

Q. And when she came back to you with a survey of that line, was that line where you and she agreed that it was going to be?

A. It was, like I say, west of where I thought it would be."

Gilliland's second point, implicitly if not explicitly, concedes that in order for the City to be held to the settlement agreement, it was essential that the action of the board of aldermen on September 13, 1984, fulfill "the mandatory requirements of § 79.130, RSMo 1978." [7] Consequently, in deciding Gilliland's second point, we need not, and do not, decide whether any action by the aldermen other than approving the settlement *by ordinance* would have bound the City. Those interested in that question can see *Standley v. City of Van Buren,* 217 S.W.2d 711 (Mo.App.1949), contract between city of fourth class and utility company whereby latter would supervise project extending city's water system valid only if authorized by ordinance; and *Dearmont v. Mound City,* 278 S.W. 802 (Mo. App.1925), attorney retained by municipality to defend it in lawsuit not entitled to compensation where no ordinance was enacted employing him.

Gilliland, citing *Aurora Water Co. v. City of Aurora,* 129 Mo. 540, 31 S.W. 946 (1895), insists it was unnecessary for the settlement proposal "to be read three times in order for the bill to be valid." While *Aurora Water Co.* undoubtedly stands for that proposition, it does not solve Gilliland's problem here.

Gilliland's problem is that § 79.130 [8] provides that no ordinance shall be passed except by *bill.* In our view, the City's aldermen, on September 13, 1984, passed

---

**7.** Section 79.130, RSMo 1978, provides, in pertinent part:
  "The style of the ordinances of the city shall be:
  'Be it ordained by the board of aldermen of the city of . . ., as follows:' No ordinance shall be passed except by bill, and no bill shall become an ordinance unless on its final passage a majority of the members elected to the board of aldermen shall vote for it, and the ayes and nays be entered on the journal; and all bills shall be read three times before their passage. . . . No bill shall become an ordinance until it shall have been signed by the mayor or person exercising the duties of the mayor's office, or shall have been passed over the mayor's veto, as herein provided."

**8.** Footnote 7, *supra.*

no *bill* authorizing its officials to enter into a settlement of the lawsuit with Gilliland.

In *State ex rel. Gove v. Tate,* 442 S.W.2d 541 (Mo. banc 1969), our Supreme Court faced the issue whether a city of the fourth class had enacted an ordinance authorizing a condemnation suit. The court said no, emphasizing that the record contained only a resolution which, although signed by the mayor and containing a statement of the ayes and nays, was not in the form of a bill and was not read three times before passage. It did not, therefore, meet the requirements of § 79.130 as to how an ordinance should be passed. *Id.* at 542[1]. As it was only a resolution, it would not suffice when action on the part of a municipality is required to be taken by ordinance. *Id.* at 542[2]; *Julian v. Mayor, Councilmen and Citizens,* 391 S.W.2d 864, 866–67[9] (Mo.1965).

■■■ If the aldermen's action in *Gove* did not constitute the enactment of an ordinance, then clearly the action of the City's aldermen on September 13, 1984, in the instant case did not constitute the enactment of an ordinance. Nothing identified as a "bill" was introduced, and the proposal approved by the aldermen did not begin "Be it ordained by the board of aldermen of the city of Gainesville, as follows:". Indeed, the minutes themselves characterized the proposal as a "motion," not an ordinance or a bill.

Gilliland's second point is without merit.

Her third point states:

"The trial court erroneously applied the law to the facts ... in failing to find that [the City] and Gilliland reached a settlement agreement, and thereafter enforcing it, because the terms of the settlement satisfied the elements of § 432.-070, RSMo 1978, in that the minutes of the city council meeting of September 13,

1984, was a writing which set forth the consideration of the settlement agreement, and was subscribed by a duly appointed agent of [the City], the city clerk, Velma Hambleton [sic], and Mayor Sullivan communicated the acceptance of city council of the settlement to Gilliland."

Section 432.070, RSMo 1978,[9] cited in the above point, provides, among other things, that when a city makes a contract, "such contract, including the consideration, shall be in writing."

In *Bride v. City of Slater,* 263 S.W.2d 22 (Mo.1953), a supplier of fuel oil sued a municipality for a sum allegedly owed for oil supplied the municipality under a written contract. The petition averred that the price was "to be fixed at the seller's market price on the date of shipment." The trial court dismissed the petition on the ground that it showed on its face that the alleged contract was void under § 432.070, in that the contract failed to state in writing a definite price or consideration for the fuel. *Id.* at 23. In upholding the dismissal, the Supreme Court emphasized that the price the municipality was to pay was not in any certain sum, but was entirely conditioned on the will of the supplier. *Id.* at 25. The contract was thus void and unenforceable. *Id.* at 26–27.

■■■ That holding is applicable here. Even if the minutes of the September 13, 1984, meeting of the City's board of aldermen satisfied all of the other requirements of § 432.070—and we do not decide whether they do—the minutes do not describe the consideration to be received by the City with such specificity that the agreement could be enforced.

The minutes refer to "the land and a possible fence line she was offering to the City for settlement of the lawsuit," and the minutes state that Gilliland will pay "for a

---

9. Section 432.070, RSMo 1978, provides, in pertinent part:

"No ... city, town, ... or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consid-

eration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

new survey and will also move the fence." The only other clue as to what land the City would receive in the settlement is that it is "on top of the hill." There was, at the time of the September 13, 1984, meeting, no plat of a survey showing the tracts to be quitclaimed, respectively, by the City and by Gilliland. Surveyor Rozell did not prepare the plat and determine the legal descriptions of the two tracts until December, 1984, three months after the September aldermen's meeting.

If the contract in *Bride* was void for failure to specify the consideration the municipality was receiving, the minutes of the September 13, 1984, aldermen's meeting were, for the same reason, insufficient to constitute an enforceable contract under § 432.070. Gilliland's third point is, accordingly, denied.

The only remaining assignment of error by Gilliland pertaining to the issues between her and the City is her point number 7, which concerns not only the issues between Gilliland and the City, but also the issues between Gilliland and the Overturfs. As appears more fully *infra* in the discussion of that point, it affords no basis for reversal of that portion of the judgment denying Gilliland relief on Counts III and IV of her third amended counterclaim. We therefore hold that the portion of the judgment pertaining to those counts should be affirmed.

We now have reached the issues between Gilliland and the Overturfs.

Gilliland went to trial on her amended third-party petition against the Overturfs, consisting of three counts. Count I averred that the Overturfs, in conveying the Overturf farm to the Blisards, the Wallaces, and Gilliland in 1979, fraudulently represented and expressly warranted that the land described in that conveyance included the land between the east line of the southeast quarter of the northwest quarter of section 4 and the fence along the east boundary of the airport. Count I further alleged that Gilliland had thereafter acquired the interests of the Blisards and the Wallaces, that the City was claiming it owned land east of the fence, and that if the City prevailed, Gilliland should recover from the Overturfs the fair market value of any land the City was found to own east of the fence, plus the diminution in value of the remaining land resulting from loss of the land awarded to the City. Additionally, said Count I, the Overturfs owed Gilliland the costs, expenses, and attorney fees incurred in defending against the City's claim.

Count II was based on the special warranty deed of August 22, 1980, from the Overturfs to Gilliland. Count II pleaded that the Overturfs, by reason of that instrument, were obligated to "warrant and defend" Gilliland's title to the land described therein. Count II asserted that if the City were awarded any of that land, Gilliland was entitled to the same relief from the Overturfs that she sought in Count I. Additionally, Count II prayed that the Overturfs indemnify Gilliland for her costs, expenses, and attorney fees incurred in defending against the City's claim.

Count III, as we interpret it, sought a decree reforming the 1979 deed from the Overturfs to the Blisards, the Wallaces, and Gilliland, so that the land described therein would include all of the land east of the fence situated east of the airport.

In addition to answering Gilliland's amended third-party petition, the Overturfs filed a counterclaim against Gilliland. The Overturfs went to trial on an amended counterclaim consisting of four counts.

Count I of the Overturfs' amended counterclaim averred that the special warranty deed of August 22, 1980, from them to Gilliland did not obligate them to defend the title to the land described therein against the claims of anyone except themselves. Moreover, pleaded Count I, no consideration was given by Gilliland or received by the Overturfs for the special warranty deed. Count I prayed the court to declare whether the special warranty deed was "valid and effectual," and, if so, to declare whether it compelled the Over-

turfs to defend Gilliland's avowed interest in the land against the suit by the City.

Count II alleged that the Overturfs were induced to sign the special warranty deed by false and fraudulent representations by Blisard, the "agent and/or employee" of Gilliland. Specifically, said Count II, Blisard represented that the special warranty deed "was nothing more than a quit claim deed and was for the purpose of saying that the fence was there." Further, pleaded Count II, the Overturfs were told that they "would not get involved in a lawsuit." Count II prayed the court to cancel the special warranty deed.

Count III realleged the averments of Count II, adding that the Overturfs had been damaged by the false and fraudulent representations and by the execution of the special warranty deed. Count III prayed for $10,000 compensatory damages.

Count IV mirrored Count III, and characterized the alleged misrepresentations as willful, wanton, and malicious. Count IV prayed for $25,000 punitive damages.

We explained earlier that on August 22, 1980, at Gilliland's request, Blisard, a notary public, took the special warranty deed to the Overturfs for execution. Regarding that episode, the trial court, in its findings of fact, found:

"17. That Mr. Blizzard [sic] represented to Mr. and Mrs. Overturf at the time he delivered and presented the Special Warranty Deed to them that the Special Warranty Deed was nothing more than a Quit-Claim Deed and was for the purpose of saying that the fence line on the west side of the property had been there for many years so that the fence could be established as the boundary line and he told them that they would not get involved in any lawsuits.

⋅ ⋅ ⋅ ⋅ ⋅

19. That [the Overturfs] executed the Special Warranty Deed relying upon the statements of W.J. Blizzard [sic] that the deed was like a Quit-Claim Deed and was for the purpose of saying that the fence

on the west side of the property had been in existence for many years and his statement that they would not get involved in a lawsuit."

While Blisard denied making such statements, the testimony of the Overturfs, which we need not recite, was more than ample to support the trial court's findings.

The trial court adjudicated the claims between Gilliland and the Overturfs as follows.

On Count I of Gilliland's amended third-party petition, the trial court, as previously mentioned, found that the Overturfs did not represent that the west boundary of the land described in the May 16, 1979, deed to the Blisards, the Wallaces, and Gilliland was the fence east of the north runway. Additionally, the trial court found that the City was asserting no claim to any land conveyed by that deed. Accordingly, the trial court entered judgment on Count I in favor of the Overturfs and against Gilliland.

On Count II of Gilliland's amended third-party petition, the trial court likewise ruled in favor of the Overturfs and against Gilliland. This ruling was based on several grounds, the first of which was that the trial court, as appears more fully *infra*, had concluded—in connection with Count II of the Overturfs' amended counterclaim—that the special warranty deed of August 22, 1980, from the Overturfs to Gilliland should be cancelled and set aside. That, of course, would free the Overturfs from any duty to defend Gilliland's avowed interest in the tract described in that deed against the City's claim. Alternatively, the trial court concluded that if it were in error in cancelling the special warranty deed, Gilliland still had no claim against the Overturfs on Count II of her amended third-party petition, as the covenant of the Overturfs in the special warranty deed required them to defend the title to the property described therein only against claims and encumbrances made by them, not by anyone else.[10] Moreover, the trial court ruled

10. The habendum clause in the special warranty deed was: "To hand [sic] and to hold the said

that because the special warranty deed did not contain the phrase "grant, bargain and sell," Gilliland did not have the benefit of "the warranties or covenants provided for in Section 442.430 (R.S.Mo)." We assume that the statute to which the trial court intended to refer was § 442.420, RSMo 1978, and that the number appearing in the judgment is a typographical error.

As to Count III of Gilliland's amended third-party petition, the trial court found no evidence of mistake or fraud that would support reformation of the 1979 deed from the Overturfs to the Blisards, the Wallaces, and Gilliland. The trial court therefore ruled for the Overturfs and against Gilliland on that count.

Regarding Count I of the Overturfs' amended counterclaim, the trial court observed that it raised the same issues as Count II of Gilliland's amended third-party petition. For the same reasons articulated in its ruling on the latter count, the trial court entered judgment in favor of the Overturfs and against Gilliland on Count I of the Overturfs' amended counterclaim.

On Count II of the Overturfs' amended counterclaim, the trial court found that the Overturfs were induced to sign the special warranty deed of August 22, 1980, by the fraudulent representations of Blisard that said instrument was nothing more than a quitclaim deed, that it was for the purpose of demonstrating that the fence line on the west side of the property had been there for many years, and that the Overturfs would not get involved in any lawsuits. The trial court further found that at the time Blisard said those things, he was "acting as the agent" for Gilliland. The trial court therefore entered judgment cancelling the special warranty deed.

On Counts III and IV of the Overturfs' amended counterclaim, the trial court found the evidence insufficient to support an award of damages. Consequently, the trial court entered judgment on those counts in favor of Gilliland and against the Overturfs.

Gilliland, as we comprehend her brief, appeals from that portion of the judgment (a) denying relief on Count II of her amended third-party petition, and (b) granting the Overturfs relief on Counts I and II of their amended counterclaim. Gilliland does not attack that portion of the judgment denying relief on Counts I and III of her amended third-party petition.

The Overturfs did not appeal; consequently, the denial of relief on Counts III and IV of their amended counterclaim is not before us for review.

We bypass, for the moment, Gilliland's fourth point—the first pertaining to the issues between her and the Overturfs—and consider her fifth, which asserts that the trial court, in applying the facts to the law, erred by holding that findings of fact numbered 17 and 19 (quoted above) justified cancellation of the special warranty deed. The point states:

"The trial court ... erroneously declared ... that the special warranty deed ... should be cancelled due to alleged representations of Blisard to the Overturfs, namely, that the special warranty deed 'was like a quit claim deed'; that the special warranty deed meant that the fence line was the boundary line; and that the special warranty deed would keep the Overturfs out of a law suit [sic]; because these alleged representations are, if anything, representations and opinions of law which are not actionable; in that Blisard did not allegedly misrepresent any fact upon which the Overturfs were entitled to rely upon in signing the special warranty deed.

Furthermore, the Overturfs could not (and cannot) rely upon these representations and opinions of law because Blisard did not possess, or profess to possess, a superior knowledge of the law. Nor did Blisard hold a relation of trust and confi-

Brenda M. Gilliland and unto her heirs and assigns forever, with all appurtenances thereunto belonging. And we hereby covenant with the said Brenda M. Gilliland that we will forever warrant and defend the title to said lands against all claims and encumbrances done or suffered by us, but against none other."

dence with the Overturfs, thereby entitling the Overturfs to rely on the alleged statements concerning the special warranty deed."

In support of this point, Gilliland cites *Whittlesey v. Spence*, 439 S.W.2d 195 (Mo. App.1969). There, purchasers of real estate ignored a written title opinion prepared by their lawyer, and instead asked a realtor about the condition of the title. His statement, "It looks all right to me," was held to be the expression of an opinion and conclusion of law, not a representation of fact sufficient to support an action for fraudulent misrepresentation. *Id.* at 198[3].

Gilliland also cites *Motor Transportation Springfield v. Orval Davis Tire Co., Inc.*, 585 S.W.2d 195 (Mo.App.1979), representation by lessor's agent to lessee's agents as to what the legal liability of the lessee would be upon early cancellation of a labyrinthine vehicle lease agreement cannot be used as a defense by the lessee in an action by the lessor for breach of the lease; *Fredrick v. Bensen Aircraft Corp.*, 436 S.W.2d 765 (Mo.App.1968), promotional literature stating that gyrocopter would "get you in the air quicker," even if construed as a representation that aircraft could be legally flown in compliance with all Federal Aviation Agency rules and regulations, is no more than the mere expression of a legal opinion, and therefore not a basis for an action for fraudulent misrepresentation; and *Sewell v. Ladd*, 158 S.W.2d 752 (Mo. App.1942), representation that a written lease was only a waiver of one year's rent will not support action to cancel lease on basis of fraudulent misrepresentation.

The Overturfs, however, direct our attention to *Schellhardt v. Schellhardt*, 253 S.W.2d 181 (Mo.1952). There a man told his wife that the instrument she was signing was a will, and she believed him. The document was in fact a deed conveying entireties property to the husband's children by a prior marriage, reserving a life estate in the wife and her husband. The wife was paid nothing for the deed. A judgment setting the deed aside was upheld.

The Overturfs also cite *White v. Whitaker*, 171 S.W.2d 684 (Mo.1943), where an elderly woman believed she was signing a will, but in fact it was a deed conveying her home to a daughter, reserving a life estate. A decree cancelling the deed was upheld despite the lack of evidence that the daughter, or anyone on her behalf, misrepresented the nature of the instrument. The opinion held there was "legal if not actual fraud." *Id.* at 686[2].

In our view, *Schellhardt* and *White* are more akin to the instant case than *Whittlesey, Motor Transportation Springfield* and *Fredrick*. In *Whittlesey*, the representation did not concern the nature of a written instrument, but rather the quality of the title to the property. In *Motor Transportation Springfield*, the representation concerned the rights and liabilities of the parties in the event of cancellation of the lease. In *Fredrick*, the representation concerned whether the aircraft could be flown in compliance with FAA rules and regulations. It is evident that the representations in those three cases were in the nature of legal advice, not representations about the kind of written instrument a party was signing.

We recognize, of course, the general rule that a party has no right to rely on the representations of another party as to the legal effect of a written instrument. *Motor Transportation Springfield*, 585 S.W.2d at 200[1]. We are likewise mindful of the two exceptions: (1) where there is a relation of trust and confidence between the parties, or (2) where one party is possessed, or professes to be possessed, of a superior knowledge of the law and takes advantage of the other party's ignorance of the law to mislead him. *Id.*

We are unconvinced, however, that any of those rules apply here. Blisard did not undertake to advise the Overturfs about the rights and liabilities flowing from the special warranty deed. He told them—according to the trial court's findings—only that the special warranty deed was nothing

more than a quitclaim deed and was for the purpose of saying that the fence line on the west side of the property had been there for many years so that the fence could be established as the boundary line. Those circumstances, in our view, bring the instant case within the holdings of *Schellhardt* and *White*.

*Sewell* is the only case cited by Gilliland in which there was a misrepresentation as to the nature of the written instrument itself. While there may be disharmony between *Sewell* on the one hand, and *Schellhardt* and *White* on the other, we need not endeavor to reconcile whatever conflict may exist. *Schellhardt* and *White* are decisions of the Supreme Court of Missouri, while *Sewell* is a Court of Appeals case. We are bound to follow the last controlling decision of the Supreme Court of Missouri. Mo. Const. art. V, § 2; *Estate of Seabaugh*, 654 S.W.2d 948, 957[4] (Mo.App. 1983).

■ If equity can cancel a deed when it is represented to the grantor as a will, as in *Schellhardt*, and can cancel a deed when the grantor mistakenly believes it is a will, as in *White*, the power of equity is surely broad enough to cancel the special warranty deed here, where the trial court found that it was represented by Blisard as a quitclaim deed to be used simply to establish that the fence had been in place for many years.

It is clear that the Overturfs received nothing of value for the special warranty deed. Gilliland conceded on cross-examination that the Overturfs were paid no money for it, and that the only consideration was that she (Gilliland) "[a]greed not to sue them right then." While such forbearance might, at first glance, appear to constitute consideration, the Overturfs correctly point out that the length of time during which Gilliland was to forbear was not specified. A promise to forbear for such time as one may elect is insufficient consideration, 17 Am.Jur.2d *Contracts* § 115, pp. 462–63 (1964), as it imposes no obligation to forbear for any length of time. 17 C.J.S. *Contracts* § 103.d., p. 820 (1963).

■ We are mindful of the general rule that mere absence of consideration is not sufficient to warrant relief by way of equitable cancellation of a deed in the absence of some additional circumstance creating an independent ground for granting cancellation, such as fraud or undue influence. *Drake v. Greener*, 523 S.W.2d 601, 606[2] (Mo.App.1975). But where a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in the particular case. *Id.* at 606[3].

We hold that the absence of consideration for the special warranty deed, coupled with Blisard's misrepresentation that it was a quitclaim deed for the purpose of establishing that the fence line had been in place for many years, supplied ample grounds for the cancellation of the special warranty deed. Gilliland's fifth point is, accordingly, denied.

■ Gilliland's sixth point maintains that the trial court erred in finding that Blisard's statements to the Overturfs regarding the special warranty deed "were spoken as an agent of Gilliland." Gilliland insists that Blisard's statements were inadmissible against her, in that there was no evidence that she authorized Blisard to explain anything to the Overturfs about the special warranty deed.

Gilliland testified that the only instructions she gave Blisard about the special warranty deed were to take it to the Overturfs, get it signed, and notarize it. The trial court, however, was not obliged to believe that testimony. *Lee*, 668 S.W.2d at 206[8]; *Lohrmann*, 657 S.W.2d at 377.

Upon the principle of estoppel, an agency may be regarded as existing between two persons so far as a third person is concerned, although, as between the persons charged with the consequences of the relation, it does not in fact exist. *Messman v. Riss & Co., Inc.*, 255 S.W.2d 80, 83 (Mo. App.1953). In other words, where a person by his acts or conduct, has knowingly

caused or permitted another person to appear as his agent to the injury of a third person who has dealt with the apparent agent in good faith and in the exercise of reasonable prudence, he will afterwards be estopped to deny the agency when the third person seeks to hold him to account. *Id.* at 83[3]; *Will Docter Meat Co. v. Hotel Kingsway, Inc.*, 232 S.W.2d 821, 824[2] (Mo.App.1950).

Assuming, without deciding, that Blisard's misrepresentation to the Overturfs about the special warranty deed could be the basis for cancelling it only if such misrepresentation were chargeable to Gilliland, we hold that the evidence was sufficient to support a finding of agency by estoppel.

Blisard was working in the office of Goodland Realty (owned by broker Gilliland) as a licensed real estate sales agent at the time Roy Overturf went there in 1979 to list his property for sale. After Gilliland prepared and accepted the listing agreement, Blisard—according to Overturf—accompanied him to look at the property. While there, they discussed the fence east of the airport. Upon returning to the office of Goodland Realty, the handwritten notation about the strip on the west side of the Overturf property was added to the listing agreement. When Gilliland began preparing the sale contract, Overturf went to his wife's nearby office. It was Blisard who brought the contract there for the Overturfs to sign.

Joyce Overturf, so she said, asked Blisard whether her husband had informed him that the fence was not on the Overturfs' boundary. Blisard, according to Joyce, said yes.

While Blisard was the only purchaser named in the sale contract, he and his wife, along with Gilliland and the Wallaces, were named grantees in the deed the Overturfs signed May 16, 1979.

It is readily inferable that the Overturfs were expecting someone to bring them the special warranty deed in August, 1980, as Gilliland testified she told them (evidently by telephone) that they would not be sued

"right then" if they signed it. The person who delivered the deed was Blisard. He did so at the instance of Gilliland. According to the Overturfs, whose testimony the trial court found credible, Blisard told the Overturfs what the instrument was, and its purpose. As he no longer had any interest in the Overturf farm, having deeded his interest to Gilliland in December, 1979, he would have had no reason to make any representation except as a spokesman for Gilliland. His only source of knowledge that the Overturfs would not get involved in a lawsuit would have been Gilliland, who, as we have noted, admitted telling the Overturfs that.

These circumstances, in our opinion, were sufficient to estop Gilliland from denying that Blisard was her agent at the time he obtained the Overturfs' signatures on the special warranty deed. Gilliland's sixth point is, consequently, denied.

Gilliland's fourth point, which we skipped earlier, is a multi-faceted point attacking the trial court's holding that the special warranty deed, even if valid, did not obligate the Overturfs to defend Gilliland's avowed interest in the land described therein against the City's claim. Inasmuch as we have upheld the trial court's cancellation of the special warranty deed, we need not determine what, if any, obligations it might have imposed on the Overturfs.

Gilliland's seventh, and final, point complains that the trial court erred in failing to order that the "property in dispute" be surveyed, as there are no "references to monuments, markers, U.S. Public Land Survey corners, or reestablished or restored corners in the judgment to determine the exact locations of the boundary lines." Thus, says Gilliland, the trial court's judgment or any judgment we might enter cannot be enforced without resort to extrinsic proof. If, according to Gilliland, we were to award her money damages against the Overturfs, there is no way to calculate the acreage of the disputed property, and hence no means of assessing accurate damages.

Our first observation regarding this point is that, so far as the record before us shows, no one asked the trial court to order such a survey, and no one volunteered to pay for it. A trial court should not be indicted for error for neglecting to grant relief no one requested.

More importantly, however, there is no need for us to direct the trial court to order a survey. If the City wants to make use of all of the land conveyed to it by the 1947 deed from the Smiths and eject any squatters, the City is free to arrange for a proper survey to determine where the tract described in that conveyance is located on the ground.

If Gilliland desires to pursue Count II of her third amended counterclaim, which we are remanding for a new trial, she is free to arrange for a proper survey to determine the location, on the ground, of the tract described in the deed to her from the Kimzeys, and to determine whether any of the land described in the Bushong deed overlaps it. She may, if she chooses, proceed under chapter 446, RSMo 1978, and endeavor to recover the expenses thereof per § 446.170, RSMo 1978. The City, of course, is likewise free to order a survey to ascertain the location, on the ground, of the tract described in the Bushong deed, and to determine whether any of that tract overlaps the tract described in the Kimzey deed.

Gilliland's seventh point supplies no basis for disturbing any of the trial court's rulings.

That portion of the judgment finding the issues in favor of Gilliland and against the City on the City's amended petition, and that portion of the judgment finding the issues in favor of Gilliland and against the City on Count I of Gilliland's third amended counterclaim are reversed. Pursuant to the authority vested in us by Rule 84.14, Missouri Rules of Civil Procedure (17th ed. 1986), judgment is hereby entered in favor of the City and against Gilliland on the City's amended petition, and in favor of the City and against Gilliland on Count I of Gilliland's third amended counterclaim. Specifically, it is ordered, adjudged, and

decreed that the City is vested with title in fee simple absolute in the following described property, and that Gilliland has no right, title, or interest therein:

All of that part of the southeast quarter of the northwest quarter of section 4, township 22 north, range 13 west, in Ozark County, Missouri, lying east of State Highway, Route "E", containing 13.7 acres, more or less.

That portion of the judgment pertaining to Count II of Gilliland's third amended counterclaim is reversed, and the cause is remanded for a new trial as to that count only.

The trial court, as we understand its judgment, taxed the costs against the City. The portion of the judgment taxing costs is reversed, and all costs to date, taxable by statute or court rule, including the costs of these appeals, are taxed against Gilliland.

In all respects other than those heretofore mentioned, the judgment of the trial court is affirmed.

PREWITT, C.J., MAUS, J., and FRANK CONLEY and GARY A. FENNER, Special Judges, concur.

HOGAN, P.J., not participating.